2007-NMCA-055

161 P.3d 262

STATE of New Mexico, ex rel. CHIL-
DREN, YOUTH AND FAMILIES DE-
PARTMENT, Petitioner–Appellee,

v.

WILLIAM M., a/k/a William M–R.,
Sr., Respondent–Appellant,

and

In the Matter of William M–R., Jr.
and Joel M–R., children.

No. 26,258.

Court of Appeals of New Mexico.

March 7, 2007.

Certiorari Denied, No. 30,313,
May 11, 2007.

768

New Mexico Children, Youth and Families Department, Daniel J. Pearlman, Children's Court Attorney, Santa Fe, NM, for Appellee.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Appellant.

Kathleen A. Wright, Guardian ad Litem, Albuquerque, NM, for Children.

## OPINION

BUSTAMANTE, Judge.

{1} William M.R., Sr. (Father) appeals from a judgment terminating his parental rights to William M–R., Jr. and Joel M–R. (the Children), pursuant to NMSA 1978, §§ 32A–4–28(B)(1) and (2) (2005). On appeal, Father argues that (1) he was denied due process because the Children, Youth and Families Department (the Department) did not provide Father with written materials in Spanish, (2) he was denied effective assistance of counsel due to the limited ability of his court-appointed attorney to communicate with him in Spanish, and (3) there was not clear and convincing evidence to support the termination of Father's parental rights. Finding no merit in Father's arguments, we affirm.

## I. FACTS AND PROCEDURE

{2} On April 20, 2004, the Department took the Children into custody after Deyonira S. (Mother) left them with an acquaintance who had agreed to care for the Children for a "few minutes." The Children were left without food, clothing, or contact information for seven hours. The Children were hungry and dirty and had no shoes. William, who was born on November 11, 1999, was four years old. Joel, who was born on August 24, 2000, was three years old.

{3} Two days later, the Department filed a petition alleging that Mother and Father had abused or neglected the Children. According to the petition, Mother contacted the Department on April 21, 2004, requesting the Children's return, but subsequently disappeared. Despite extensive efforts to locate Mother, she was not heard from again. According to the Department, Mother had a history of substance abuse, domestic violence, and homelessness. The subject of thirteen referrals to the Department on allegations of abuse and neglect from 1997 to 2004, Mother had already lost custody of three other children, including Rosa, who was Father's daughter and the Children's older sister. In an attempt to prevent removal of William and Joel, the Department offered services to Mother between September 2003 and March 2004.

{4} At the time the Children were taken into custody, Father's location was unknown. It was later determined that Father was incarcerated. The Department reported that Father had a history of drug use and criminal activity. Father was convicted of trafficking cocaine in 2000. Although he received a probationary sentence, Father violated his probation and was incarcerated in February 2002. At the time Father was incarcerated, William was two years old, Joel was one, and Father was not living with them.

{5} Father had several children with different mothers and a history of prior involvement with the Department. Father had left one daughter in Cuba with her mother. In between fathering Rosa and the Children with Mother, Father had a son, Tremane, with a different mother. Father later relinquished custody of Rosa. Father's parental rights to Tremane were involuntarily terminated on April 7, 1999, just seven months before William was born.

{6} On May 19, 2004, Father filed a response to the abuse and neglect petition after the trial court appointed Cristen Conley to represent Father. Conley, who speaks Spanish, previously represented Father in the case involving Tremane.

{7} At the adjudicatory hearing on June 14, 2004, Father appeared by telephone from prison with counsel and the help of an interpreter. The Children's guardian ad litem (GAL) told the court that the Children were very young and appeared to be quite disturbed. The GAL described their behavior as aggressive and feral. Extensive treatment was anticipated for the Children.

{8} According to the Department, Father had not provided care or support for the Children during his incarceration and needed to re-establish a relationship with them through supervised visitation. The Department recommended a treatment plan that required Father to visit with the Children at the discretion of the Department, provide social and treatment history to assess the need for further services, and maintain a drug-free lifestyle upon his release. While incarcerated, Father was encouraged to write to the Children. At Father's request, the Department requested a home study of his mother in Florida to see if the Children could be placed with her until Father's release, which was scheduled for August 2004. The court expressed concern that Father needed to do more to parent the Children and said the Department would assist Father on his release to attain the necessary parenting skills. Father's counsel asked the interpreter to translate the items in the treatment plan for Father and asked that the record reflect that he was told about the relevant items.

{9} The trial court found that judgment on the pleadings was proper due to Father's incarceration, his inability to care for the Children, and his failure to provide an appropriate caretaker. The court found the allegations of the abuse and neglect petition true as to Father, adjudicated the Children as abused and neglected, and adopted the treatment plan. The permanency plan was reunification with a concurrent plan of placement with relatives. The court asked that Father be transported to appear in person for the next judicial review.

{10} On July 28, 2004, Father was transported from the penitentiary and attended the initial judicial review with counsel and the assistance of an interpreter. The Department said that the circumstances had not changed: Mother had not resurfaced, Father was still incarcerated, and the Children had severe problems. The Department noted that Father was not in a position to be involved with the treatment plan but had some contact with the Department and had asked for the Children to be placed with his family in Florida.

{11} Father's counsel told the court that she was concerned that the social worker for the Department did not speak Spanish and there was no mechanism for Father to be able to communicate with the social worker. The court discussed the status of the case and the treatment plan directly with Father, who responded to some of the court's questions before they were translated into Spanish. The exchange caused Father's counsel to remark that she was impressed that Father had learned so much English since the last time she had represented him. The trial court noted that Father appeared to understand English very well but agreed to add language to the treatment plan directing the Department to be sensitive to the fact that Father's primary language was Spanish.

{12} The court-appointed special attorney reported that the Children had extreme behavioral problems and developmental delays. The attorney did not support placing the Children with Father's mother in Florida because Rosa, the Children's sibling, allegedly had tried to stay with her grandmother and was returned to New Mexico within a couple of months because the grandmother could not handle her. Although not aware of that history, the Department wanted the home study to go forward because Father's sister was a possible placement.

{13} The trial court found that the Department had demonstrated reasonable efforts to implement the treatment plan by maintaining contact with Father and initiating the home study. The court found that Father had not

been able to make sufficient efforts to comply with the treatment plan due to his incarceration and had not made sufficient progress toward alleviating the causes of neglect. The court also found that Father had not made a diligent, good faith effort to maintain contact with the Children. The court determined it was in the best interests of the Children to remain in the custody of the Department. The treatment plan requirements for Father remained the same. At the request of Father's counsel, the court added: "The Department shall be sensitive to the fact that [Father's] primary language is Spanish."

{14} In December 2004, the New Mexico Child Abuse and Neglect Citizen Review Board (Board) recommended that the Children not be placed with relatives in Florida because the Children were severely damaged and had highly emotional, mental, and behavioral problems that required professional care and highly skilled parenting. Father's counsel reported to the board that she did not think Father understood, or was able to understand, how damaged the Children were. She said that she spoke Spanish and sent reports to Father but did not translate all the paperwork. Father's counsel also noted that Father, who was due to be released in December 2004, was going to be paroled to his mother and sister in Florida. If that happened, the Children could not be placed in the same home. Father submitted a letter to the Board, which was translated into English. Father said that the treatment plan was the correct decision.

{15} Father was transported to the permanency hearing on February 16, 2005, and appeared with counsel and the assistance of an interpreter. Although Father had finished his sentence on December 16, 2004, he was still incarcerated with an unknown release date because he was waiting for approval of his parole plan to Florida. The Department recommended changing the permanency plan for the Children to adoption because Father was not available and his parental rights to a prior child had been terminated involuntarily. The Department claimed that, despite regular updates, Father failed to appreciate the intensity of his Children's problems and on-going treatment needs. The Department noted it was still waiting for the results of the home study on Father's sister.

{16} Father's counsel questioned whether the Department's impression that Father did not understand the Children's condition was due to a cultural element. She requested that Father be allowed to address the court directly about the Children, which Father did through an interpreter. Father said he felt guilty about what the Children were going through and that he would like to do his best to help them. He stated that he was not escaping his responsibilities by being paroled to Florida but that he wanted to go there because he had not seen his mother in years. When counsel asked about not taking the Children's condition seriously, Father said he was thankful for what the Department was doing but that the report was wrong in stating that the Children would do better with another family. Father said that with help from programs and the love of his family, he was hopeful that the Children would be able to overcome this time in their lives and that he would like to do anything he could to have custody of the Children. Father's counsel told the court that Father thought the treatment plan was appropriate for him and that he was willing to participate either by phone if paroled in Florida or in person in New Mexico.

{17} The GAL noted that the Children had made slow progress and did not talk about Father. According to the GAL, the Children had no memory of Father and thought he was one of Mother's boyfriends.

{18} The Department brought to the court's attention that it had received a handwritten motion to substitute counsel that had been written while Father was incarcerated. The court had not seen the motion because it was never filed. Father's counsel told the court that the issue was moot. She explained that at one point Father was unhappy with his ability to communicate with counsel after some difficult telephone conversations, but that the matter had been resolved and that Father was comfortable with counsel's representation. The trial court stated that Father's counsel knew what she was doing and was experienced in

abuse and neglect proceedings. Father did not object.

{19} The court found that the Department had made reasonable efforts to assist Father in adjusting the conditions which rendered him unable to properly care for the Children. The court found that Father had not been in a position to comply with the treatment plan due to his incarceration and had not made sufficient progress toward alleviating or mitigating the causes necessitating placement of the Children in foster care. The court also found that Father had not made a diligent, good faith effort to maintain contact with the Children. The court found there was no evidence that either parent was equipped to take custody of the Children at the time. Thus, the court found it was in the best interests of the Children for the Department to maintain custody and to implement a further treatment plan to promote possible permanent placement of the Children while allowing for possible reunification with Father should he become available to parent in the near future. The court adopted the treatment plan, which was amended to require Father to participate in monthly treatment team meetings and other treatment activities when appropriate as well as to adhere to his conditions of probation, notify the Department of any impending move, and maintain a stable living environment upon his release. The court approved the change of the permanency plan to adoption.

{20} On February 22, 2005, the Department filed a motion for termination of parental rights on grounds of abandonment and abuse or neglect. The Department's factual allegations were that (1) the Children had been adjudicated as neglected, (2) Father had been incarcerated throughout the proceedings, (3) Father did not take an active role in caring for the Children prior to his incarceration, (4) Father disregarded the Children's welfare and allowed Mother to be the primary caretaker despite the fact that he was aware that Mother was not an appropriate parent, (5) Father had relinquished his parental rights to an older child in part because Mother was unable to care for the child, (6) Father knew Mother had lost custody to three other children due to neglect and instability, (7) Father previously had his parental rights terminated to another child after leaving the child with an unstable mother during a prior incarceration and then failing to take steps to become involved and maintain contact with the child, (8) Father chose to resume his relationship with Mother and fathered two more children with her instead of attempting to regain custody of his other child, and (9) the circumstances surrounding the neglect of the Children was similar to the pattern of neglect demonstrated by Father in regards to the child for whom he lost parental rights. The Department also claimed that Father had exposed the Children to aggravated circumstances and that no further efforts to assist Father were warranted. The Department further alleged that the Children were highly disturbed and developmentally delayed and needed very skilled parenting to overcome the effects of the neglect. Due to their young age, the Department claimed the Children were adoptable and that termination of parental rights would promote their physical, mental, and emotional welfare.

{21} On April 7, 2005, Father filed a response to the motion for termination in English, with each paragraph translated into Spanish. Father argued that the causes and conditions of neglect and abuse had changed and that he was able to care for or arrange care for the Children. He also denied the allegations of abandonment, claiming he had no knowledge of Mother's inability to care for the Children during his incarceration.

{22} In a report prepared on July 15, 2005, the Board recommended that termination be finalized and that the Children be placed for adoption in a two-parent home due to their reactive attachment disorder (RAD) and brain injury. The Board reported that Florida had not cooperated with the requested home study. The Board said there was no evidence of Father's care, history, or involvement with the Children. A social worker for the Department told the Board that the home study with Father's sister in Florida did not look hopeful because of the Children's high needs.

{23} At the termination hearing on August 4, 2005, Father appeared in person with

counsel and the aid of an interpreter. The Department argued that Father had neglected the Children by allowing Mother to be the primary caretaker even though he knew she was an inappropriate parent and that Father squandered an opportunity to parent the Children when he violated probation and became incarcerated. Because Father had his parental rights to another child terminated under similar circumstances, the Department claimed that aggravating circumstances existed, and thus no further efforts were required. The Department argued that the needs of the Children were very high because they were significantly damaged by the lack of good parenting and that Father was responsible by omission. The Department maintained that it would be in the best interests of the Children to go forward with termination in order to free them for adoption.

{24} In response, Father's counsel claimed that Father had lived with the Children for the first two and three years of their lives prior to his incarceration. She argued that Father took an active role by helping to transport the Children to daycare and going at least once to a doctor's appointment. She said that Father had completed his sentence, was serving parole in Miami, had submitted clean drug tests, and was married, employed, and had a steady place to live. Counsel argued that Father had a recent understanding of how severely damaged the Children were, but that Father was aware of how to obtain services and was prepared to take on the challenge. Counsel complained that Father received virtually no services from the Department in his language.

{25} In support of its motion for termination, the Department introduced the following evidence. A social worker at University of New Mexico Children's Hospital testified that Mother and Joel tested positive for cocaine when Joel was born. The social worker testified that she never saw Father and there was no indication that Father was involved in the care of the Children.

{26} The Department's expert in counseling and the Children's therapist testified that the Children would need extensive therapy because their emotional, behavioral, and developmental problems were so severe. In addition to RAD, the Children were diagnosed with various disorders, including post-traumatic stress disorder (PTSD), which the expert in counseling testified probably were caused by neglect and abandonment and witnessing a great deal of domestic violence. The witnesses testified that the Children would need a strong two-parent household with very skilled parents who had undergone rigorous training in dealing with RAD. They testified that transitions are very hard for children with RAD, and thus new parents would have to be introduced to the Children slowly, preferably with the assistance of the treatment foster care parents. The expert in counseling testified that a transition to Father in Florida would be very difficult because the Children had no memory of Father and the foster treatment care parents could not be involved. She thought that the Children would be terrified by the move, which could trigger a new occurrence of PTSD.

{27} Jeromy Brazfield, a social worker for the Department, testified that he went to the penitentiary with a Spanish-speaking social worker from the Department to perform an addendum to a psychosocial evaluation on Father. In discussing Father's past history and involvement with the Children, Brazfield learned that Father did not have an active role with William and Joel. Father relinquished his parental rights to Rosa and was aware of the removal of Mother's other children. Father had a child in Cuba but was never a primary caretaker for her. Father's parental rights to Tremane were terminated.

{28} Brazfield testified that he was concerned about Father's ability to meet the Children's extreme needs. He took into consideration that Father had lost another child to termination and had never been a primary caretaker. Although Father seemed to want the Children to remain involved with his family, Brazfield said that Father never really asked what he had to do to get them back. While incarcerated, Father wrote one letter to Brazfield inquiring about the Children.

{29} When Father was paroled to Florida, Brazfield told him what he needed to do to implement the treatment plan, including complying with parole and maintaining con-

tact with the Department and treatment providers. Brazfield told Father that at a minimum he had to participate in monthly treatment team meetings. Brazfield provided Father with contact information for the treatment coordinator. Brazfield testified that he tried to contact Father on the telephone after his release and that Father responded to messages. He testified that he thought Father understood the treatment plan summaries. According to Brazfield, Father never contacted the treatment team coordinator, never expressed a desire to participate in treatment team meetings, and never asked to see the Children until the day of the termination trial. When Father's counsel questioned Brazfield about whether Father spoke enough English to participate by telephone in treatment team meetings, Brazfield said the Department anticipated that an interpreter would be needed.

{30} Another social worker for the Department testified that she attempted five times to reach Father in Florida by telephone and had no contact. She left messages and Father called back once and left a message but did not leave a number. She testified that she did not have a current address for Father. She testified that treatment foster care parents had come forward asking that their home be studied for potential adoption.

{31} Father presented two witnesses. Father's parole officer in Florida testified by telephone that so far Father had complied with parole. Father was employed at a furniture business and had submitted clean monthly urinalyses. Father was married and lived in an apartment with his wife and her two young sons.

{32} Father testified that he married on May 24, 2005. He testified that he did not know Mother was using cocaine or that Mother and Joel tested positive for cocaine when Joel was born. Father testified that he was denied parole in New Mexico. He said that he really did not understand the conditions of the Children until he heard the testimony in the hearing that same day. Father testified that his attorney had been sending him documents but they were in English and he did not understand what they said. He said he did not know what a "treatment team" meeting was. He testified that now that he is married, his wife, who is bi-lingual, can translate for him. Father said that he never received copies of treatment plans from anyone except counsel and claimed that he kept the Department informed about his contact information. He said that he only communicated with counsel fifty percent of the time and asked to have her removed because they did not communicate adequately. When the court inquired about his motion, he decided to keep his attorney because she had represented him in the past but that did not make communication any better.

{33} At the conclusion of the hearing, the court delayed ruling on termination as to Father to address Father's claims that he was denied due process and effective assistance of counsel due to a language barrier. The court asked the parties to submit case law about the duties of the Department, counsel, and the court to assist non-English speaking respondents. After hearing argument on August 19, 2005, the court found that the Department made more than reasonable efforts at communicating with Father given his inability to participate. In addition, the court found that Father was not denied effective assistance of counsel. Thus, the court found that no language barrier affected Father's performance of the treatment plan or the Department's reasonable efforts toward reunification.

{34} After closing arguments, the court entered judgment terminating Father's parental rights based on abandonment and neglect. This appeal followed.

## II. DISCUSSION

### A. Due Process

{35} Father first argues that the failure of the Department to provide written materials in Spanish denied him due process and demonstrated that the Department did not make reasonable efforts. Whether Father's due process rights were violated by the procedures utilized below is a question of law that we review de novo. *See State ex rel. Children, Youth and Families Dep't. v. Ruth Anne E.*, 1999–NMCA–035, ¶ 22, 126 N.M. 670, 974 P.2d 164.

{36} This issue was preserved at the termination of parental rights hearing when the trial court asked the parties to submit case law on the constitutional issues regarding language barriers and the translation of documents. We reach a different conclusion about preservation with respect to any argument Father might be making that the New Mexico Constitution offers greater due process protection. Although Father refers to state constitutional provisions in his brief, his argument before the trial court was limited to federal law. Father did not attempt to invoke a ruling "that the state constitutional provision at issue should be interpreted more expansively than the federal counterpart *and* provide reasons for interpreting the state provision differently from the federal provision." *See State v. Gomez*, 1997–NMSC–006, ¶ 23, 122 N.M. 777, 932 P.2d 1 (setting forth the interstitial approach for preserving an issue of broader protection under the state constitution when no precedent exists). Thus, we decline to address any claim based on the New Mexico Constitution for lack of preservation.

{37} As our cases have recognized, a parent's legal relationship with his or her children cannot be terminated without due process of law. *State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266 (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). "The essence of due process is notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *State ex rel. Children Youth & Families Dep't v. Maria C.*, 2004–NMCA–083, ¶ 26, 136 N.M. 53, 94 P.3d 796 (internal quotation marks and citation omitted). Fair notice is effective notice, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (internal quotation marks and citation omitted). A meaningful opportunity to be heard includes "an opportunity to review and present evidence, confront and cross examine witnesses, and consult with counsel, either by way of an informal or formal hearing." *Id.*

{38} Father argues that he was denied due process of law because the written reports and treatment plans were not translated into Spanish. Although Father acknowledges that he had an interpreter at every court hearing, and thus some opportunity to be heard, he contends that the failure to translate documents deprived him of adequate notice.

{39} At the outset, we note that "[d]ue process is not an abstract or static principle unrelated to time, place and circumstances." *Id.* ¶ 37 (internal quotation marks and citation omitted). "[P]rocedural due process is a flexible right and the amount of process due depends on the particular circumstances of each case." *Ruth Anne E.*, 1999–NMCA–035, ¶ 17. To evaluate due process, we apply the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Mafin M.*, 2003–NMSC–015, ¶ 19. In a termination of parental rights proceeding, where the parent's interest in retaining parental rights is strong, and the State's interest in protecting the welfare of children is also strong, the decisive factor is "the probable value, if any, of additional or substitute procedural safeguards." *Id.* ¶¶ 19–20.

{40} To the extent that Father asserts that translated versions of at least some of the documents in an abuse and neglect or termination proceeding are required as a matter of law, we are not persuaded. Father cites to no authority for the proposition that court documents must be translated into a parent's primary language or that the Department must provide an interpreter to assist in a respondent's defense directly.

{41} To the contrary, the authority provided by the Department suggests the opposite. In criminal proceedings, for example, a defendant does not have an absolute right to have documents translated. *See United States v. Gonzales*, 339 F.3d 725, 729 (8th Cir.2003) (recognizing that criminal defendants do not enjoy a constitutional right to written translations of court documents). Rather, decisions about providing translated documents are within the discretion of the trial court. *See id.* (holding it was within the trial court's discretion to determine what if

any documents needed to be translated). In addition, as a constitutional matter, the appointment of interpreters and the existence of a language barrier are matters left to the discretion of the trial court. *See United States v. Bennett*, 848 F.2d 1134, 1141 (11th Cir.1988); and *United States v. Coronel–Quintana*, 752 F.2d 1284, 1291 (8th Cir.1985) (stating that the trial court, who has direct contact with the defendant, should be given wide discretion to appoint an interpreter because the decision will likely turn on a variety of factors, including the defendant's understanding of the English language and the complexity of the proceeding, issues, and testimony). Finally, there is no constitutional right requiring the assistance of a court-appointed interpreter to supplement the right to counsel. *See Cervantes v. Cox*, 350 F.2d 855, 855 (10th Cir.1965) ("The existence of a language barrier between counsel and client is merely one circumstance probing the questions of whether the accused has been adequately represented by counsel and has voluntarily and knowingly entered his plea.").

■■■ {42} Similarly, we are not convinced that New Mexico statutory and constitutional provisions mandate that translations and interpreters be provided as a matter of law to non-English-speaking respondents in abuse and neglect or termination proceedings. Father relies on the Court Interpreters Act. NMSA 1978, § 38–10–3 (1985) (providing that a certified interpreter must be appointed to translate proceedings and testimony if requested by a non-English party-in-interest). Father also relies on provisions in the New Mexico Constitution that require assistance to non-English-speaking criminal defendants, voters, candidates for office, jurors, and public school students. *See* N.M. Const. art. II, § 14; N.M. Const. art. VII, § 3; N.M. Const. art. XII, § 8. Although Father was provided with a certified court interpreter, consistent with Section 38–10–3, he contends that these statutory and constitutional provisions also "implicitly" recognize the need for adequate notice in Spanish. As Father appears to acknowledge, these provisions do not explicitly provide an absolute right to translations and interpreters beyond what Father received in this case. Thus, we find that the provisions cited by Father do not mandate the appointment of an interpreter to assist respondents to translate documents or interpret discussions taking place outside of court. *Cf. Maso v. State Taxation & Revenue Dep't*, 2004–NMSC–028, ¶ 14, 136 N.M. 161, 96 P.3d 286 (holding, in a case where the petitioner argued that he had a right to be served with notice of a license revocation hearing in Spanish, that N.M. Const. art. XII, ¶ 8 and other provisions of the New Mexico Constitution did not "require Spanish language notice in this context, and for that reason they do not alter the federal constitutional analysis.").

{43} In the absence of an absolute right to have documents translated in abuse and neglect proceedings, our due process inquiry focuses on whether the procedures employed below placed Father at risk of erroneous deprivation of his interest in the proceedings and "the probable value, if any, of additional or substitute procedural safeguards." *Mafin M.*, 2003–NMSC–015, ¶ 19. Applying the *Mathews* test to the circumstances of this case, we conclude that Father's due process rights were not violated by the procedures employed.

{44} Father argues that an understanding of court reports and related events is critical to a parent's meaningful participation in abuse and neglect proceedings. Because of the on-going nature of the proceedings, Father contends that the reports prepared by the Department must be translated in order to provide adequate notice. Father argues that the treatment plans specify the goals to be met and the means for implementing those goals. At the very least, Father contends, the summary treatment plans distilled from the treatment plans should be translated because they provide step-by-step instructions for the parents and specific information about the needs of the children and the interventions required by caretakers. Without this basic information in the parent's language, Father claims, there can be no meaningful notice of the necessary steps to be taken to prevent loss of parental rights. Thus, he argues, translation of the summary treatment plans would provide an extremely significant improvement in a parent's ability to understand what is required of him or her.

{45} Father's arguments may have merit in the abstract, or in another case, but they do not have merit under the facts of this case. The record does not support Father's assertion that he did not understand the critical documents or that he did not have notice of the essential elements of the proceedings. Rather, our review of the record convinces us that the notice given Father was adequate to allow him a meaningful opportunity to participate in both the treatment plans and the proceedings.

{46} In this case, Father was afforded several procedural protections to ensure he had notice and an opportunity to be heard, even though English was not his primary language. First, Father was represented by a court-appointed attorney who spoke Spanish and could discuss the case with him. Father's counsel translated portions of the documents for Father. Second, Father appeared by telephone at the adjudicatory hearing and in person at all other in-court proceedings with the assistance of a certified interpreter. Third, the Department used a Spanish-speaking social worker on occasion to assist in communicating with Father. The Spanish-speaking social worker translated items in the treatment plan for Father. Even when the Department communicated with Father without the help of an interpreter, the social worker on the case testified that he was satisfied with the level of communication. Although he could not translate technical clinical information, Brazfield testified that he thought that he communicated with Father on a basic level. Finally, the record indicates that at each stage of the proceedings, the parties and the court specifically discussed the treatment plan, the Children's acute problems and treatment requirements, and Father's need to become more involved in the Children's lives if he wanted to regain custody. At the adjudication hearing, for example, Father's counsel specifically asked the interpreter to translate the items in the treatment plan for Father. Throughout the proceedings, the trial court discussed matters with Father directly through the interpreter to determine Father's understanding of events. Contrary to Father's argument, the record indicates that Father was apprized of the critical aspects of the case throughout the proceedings by his counsel, the Department, and the trial court.

{47} Moreover, the record does not support a claim that Father did not understand all the essential components of the proceedings below. Despite Father's claim at the termination hearing that a language barrier existed, Father stated several times during the proceedings that he understood the events and the documents issued by the Department. Father stated through counsel at the permanency hearing on February 16, 2005, that he understood the treatment plan, believed it was appropriate, and had no objection to it. Both the Department and the trial court were entitled to rely on Father's representations throughout the proceedings regarding the adequacy of his understanding of the court documents.

{48} Although Father argued at the termination hearing that he only communicated with counsel fifty percent of the time, Father makes no convincing argument on appeal that their communication was inadequate. While Father contends that his counsel only translated parts of the court orders and reports, he did not make a record below as to which parts were translated and how the failure to translate other parts prejudiced him. The trial court noted that Father's counsel spoke Spanish and was highly experienced and skilled in abuse and neglect proceedings. We assume that Father's counsel translated and discussed the critical aspects of the case with Father. In addition, Father expressly withdrew his request to change his legal counsel on grounds of a language barrier. The trial court questioned counsel and Father about this issue and was told it was resolved. Father made no further indication throughout the proceedings, including at the final hearing, that he wished for different counsel based on communication problems.

{49} Because he waited until the termination hearing to raise it, we are skeptical of Father's claim that he did not understand the basic information about the treatment plans, including the meaning of a "treatment team meeting," when this information was at issue from the very beginning of the proceedings. This is not a case in which the respondent

was not put on notice until the end of the proceeding or in which he understood so little English that he did not know how to ask for help. The record indicates that prior to the termination hearing, Father was able to obtain assistance when he wanted documents translated. Father attempted to file a motion for substitution of counsel that was translated into English by his caseworker at the prison. Father also filed his answer to the motion for termination of parental rights in English and Spanish. These acts indicate that Father understood enough of the proceedings that he could ask for help if needed and that help was available before the termination hearing. *Cf. Maso*, 2004–NMSC–028, ¶ 13 (holding that a reasonable person who has received an English-language notice of a proceeding which was personally served would inquire further and have the notice translated). Further, Father could notify the trial court of the need for additional procedures. We recognize that counsel broached the subject of possible communication problems at the initial judicial review by requesting that the Department be sensitive to the fact that Father's primary language was Spanish. However, by all indications, the Department acted upon this request by using Spanish-speaking social workers when necessary. If Father did not understand the basic information, he should have notified the court to enable the Department to make accommodations. Thus, the trial court was not required to believe Father's claims that he did not understand the notice given to him, which was made at the last possible minute. *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000–NMCA–025, ¶ 24, 128 N.M. 701, 997 P.2d 833 (stating that an appellate court defers to the trier of fact when it comes to assessing the credibility of witnesses).

{50} Further, the record does not support Father's assertion that if he had documents translated into Spanish, the outcome of the termination hearing would or even might have been different. *See Maria C.*, 2004–NMCA–083, ¶ 37 (stating that a respondent making a procedural due process challenge "need only demonstrate that there is a reasonable likelihood that the outcome *might* have been different"). Father's argument on

appeal focuses on the need to understand the basic information in the treatment plans because they provide instructions for the parents and information about the Children's needs. The record demonstrates that, at the very least, Father received that basic information from counsel, the Department, and the trial court. Under the circumstances of this case, we are not convinced that Father's failure to act after receiving that information was due to a language barrier. Rather, Father was unavailable to participate in the treatment plan due to his incarceration and subsequent parole in Florida. Moreover, he never demonstrated an interest in participating. To the extent that Father was able to participate, by writing to the Children or sending taped messages, he chose not to. If Father had made any attempt to comply with the treatment plan, as he was ordered to do, and the Department failed to make efforts to accommodate his language needs, then our analysis would be different. However, we are not convinced that Father's claim that he did not understand the severity of the Children's problems was due to not understanding English, but to his core parenting problems.

{51} In addition, Father makes no argument in his brief as to how translations of the treatment plans would have made a difference in his defense. Father was represented by a competent attorney who spoke Spanish and vigorously litigated his case. Father's counsel cross-examined the Department's witnesses, challenged the Department's evidence, and presented witnesses and evidence on Father's behalf. When Father's counsel questioned whether the Department's impression that Father did not understand the needs of the Children was due to a cultural element, Father was allowed to address the court directly about the Children. At the termination hearing, Father testified and had an opportunity to be heard. His parental rights were terminated only after the Department presented clear and convincing evidence to support the termination. Thus, we believe that the probable value of any additional procedural safeguards such as the translations Father requested after the fact would have been minimal to non-existent in

this case. Because Father had full notice and an adequate understanding of all critical components of the case, we hold that the procedures comported with due process requirements. We also hold that the Department made every reasonable attempt to provide adequate notice to Father and to ensure that he could participate meaningfully in the proceedings.

## B. Ineffective Assistance of Counsel

{52} Father argues that counsel's limited ability to communicate with Father in Spanish denied him effective assistance of counsel. We disagree.

{53} The right to effective assistance of counsel extends to parents in termination cases. *State ex rel. Children, Youth & Families Dep't v. Tammy S.*, 1999–NMCA–009, ¶ 20, 126 N.M. 664, 974 P.2d 158. "In reviewing a claim of ineffective assistance of counsel, we look at the proceedings as a whole." *State ex rel. Children, Youth & Families Dep't v. David F. Sr.*, 121 N.M. 341, 348, 911 P.2d 235, 242 (Ct.App.1995). "Litigants alleging ineffective assistance of counsel have the burden of establishing the claim and are required to show not only that trial counsel was ineffective, but that trial counsel's inadequacies prejudiced them." *Id.*

{54} In support of this argument, Father points to his attempt to remove counsel at one point, the fact that counsel only translated small portions of court documents, and his testimony at the termination trial that he thought he communicated with counsel "maybe 50%" of the time. Based on this evidence, Father contends that there can be no effective assistance of counsel when communication is inadequate, and this failure to communicate prejudiced his case. Father also complains that the trial court should have made a more careful inquiry into Father's understanding of the proceedings.

{55} Despite the points raised in Father's brief, we are not persuaded that Father introduced any evidence that communication between Father and his counsel was inadequate. As discussed above, until the final termination hearing, Father and his counsel took a position before the trial court that Father understood the proceedings. Although Father attempted to file a pleading that requested removal of his counsel, he chose to continue with her. The trial court inquired about the handwritten motion to substitute counsel, which was never filed, and was assured by Father's counsel that the issue had been resolved. Father, who was present with an interpreter, did not object to counsel's representation and made no further attempt to remove or replace counsel. Even though Father argues on appeal that the trial court should have made a more careful inquiry into Father's decision to retain his trial counsel, the trial court did allow Father to address the court about his understanding of the proceedings, which gave him a fair opportunity to raise any concerns about his representation. In addition, the trial court stated that Father's counsel was an experienced abuse and neglect attorney, one of the best in the state, and that she spoke Spanish. The trial court also discussed Father's claim of ineffective assistance of counsel at the termination hearing and requested the parties to brief and argue the issue. The court found that Father's counsel went above and beyond what was required. The court stated that not only were counsel and Father able to communicate, but any lack of communication did not affect Father's understanding of the treatment plan or his ability to comply with it. Although Father claimed at trial that he only understood counsel fifty percent of the time, the trial court had reason to disbelieve him.

{56} Moreover, Father does not explain how his less than complete understanding of the essential elements of the case was inadequate or prejudiced him. Rather, Father would like us to conclude that complete understanding of every document generated by an abuse and neglect proceeding is required. We disagree. To the contrary, the record indicates that Father had the assistance of a highly skilled attorney who spoke Spanish and a certified interpreter during court proceedings. The record demonstrates that if counsel thought there was a problem, she would have requested additional help in translating from the court or the Department.

{57} Regardless of whether Father's counsel could have been more fluent in Spanish, the facts on which Father's parental rights were terminated would not have been different. As we discuss below, clear and convincing evidence supported the termination of Father's parental rights. In the face of all this evidence, Father does not say how the outcome of the termination proceeding or his defense would have been different had his counsel spoken better Spanish. Rather, Father's extensive history with the Department indicates that Father knew what was at stake, and as in the past, made little effort to show that he was willing to be or could be an adequate parent. Accordingly, we reject Father's claim that the termination of his parental rights should be reversed because he was denied effective assistance of counsel.

## C. Sufficiency of Evidence

{58} Father raises five challenges to the sufficiency of evidence to support termination of Father's parental rights. Father argues that the Department failed to present clear and convincing evidence (1) that Father neglected the Children, (2) that the causes and conditions of the abuse and neglect were unlikely to change in the foreseeable future, (3) that the Department made reasonable efforts, (4) that Father abandoned the Children, and (5) that aggravated circumstances existed. All of these claims lack merit.

{59} The standard of proof in cases involving the termination of parental rights is clear and convincing evidence. *See* NMSA 1978, § 32A–4–29(I) (2005) (providing that the grounds for any attempted termination must be proved by clear and convincing evidence); *In re Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995) (same). On appeal, we do not reweigh the evidence or substitute our judgment for that of the trial court on factual matters or on matters of credibility. *Vanessa C.*, 2000–NMCA–025, ¶ 24. Rather, we view the evidence in the light most favorable to the trial court's judgment in determining whether the Department has met the clear and convincing standard. *Id.*

{60} The trial court terminated Father's parental rights under Section 32A–4–28(B)(1) and (2). Section 32A–4–28(B)(1) provides for termination when a child has been abandoned by his parents. Section 32A–4–28(B)(2) provides that parental rights shall be terminated upon a showing that the child has been an abused or neglected child as defined in the Children's Code. In order to terminate based on abuse or neglect, the court must find:

> (1) that the children were abused or neglected, (2) that the conditions and causes of the abuse and neglect were unlikely to change in the foreseeable future, and (3) that the [Department] made reasonable efforts to assist [the parent] in adjusting the conditions which rendered [the parent] unable to properly care for the children.

*Eventyr J.*, 120 N.M. at 467, 902 P.2d at 1070. Section 32A–4–28(B)(2) further provides that in some cases the court may find that efforts by the Department are unnecessary when: "(a) there is a clear showing that the efforts would be futile[ ] or (b) the parent has subjected the child to aggravated circumstances[.]" In deciding whether to terminate parental rights, the court must "give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." NMSA 1978, § 32A–4–28(A).

### 1. Substantial Evidence Supported the Trial Court's Finding of Neglect

{61} We first address Father's argument that the Department failed to present clear and convincing evidence that Father neglected the Children. Father advances this argument pursuant to *State ex rel. Children, Youth & Families Dep't v. Alicia P.*, 1999–NMCA–098, 127 N.M. 664, 986 P.2d 460.

{62} Our review of the record indicates that the Department presented clear and convincing evidence that Father neglected the Children. Father's conduct demonstrated his neglect of the Children through his failure to be involved in the Children's lives prior to his incarceration, his failure to provide a safe and stable home by dealing drugs in their home, his decision to leave the Children's home when they were very young, his

decision to violate the terms of his probation resulting in his incarceration, and his failure to provide for the Children or protect them from Mother's neglect both prior to and during his incarceration.

{63} Although Father argues that he had no reason to believe Mother was not a fit and proper custodian, the trial court was not obliged to believe Father. *See Vanessa C.,* 2000–NMCA–025, ¶ 24 (stating that an appellate court defers to the trier of fact when it comes to assessing the credibility of witnesses). Despite Father's claim that he thought he was leaving the Children in good hands with Mother, either when he left the home or when he went to prison, substantial evidence supported the opposite conclusion. *See In re R.W.,* 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.1989) (stating that the trial court is in a better position than the appellate court "to weigh conflicting evidence and decide where the truth lies"). Father claimed he was present at Joel's birth, but also claimed not to know that Mother used cocaine or that she and Joel tested positive for cocaine at Joel's birth. Mother's well-documented history of drug use and repeated referrals to the Department indicated that the Children were neglected or likely to be neglected if left in her primary care. Yet, Father made no arrangements, either before or after his incarceration, to protect the Children from Mother, to provide care for the Children, or to maintain contact with them. Based on the evidence, the trial court could properly disbelieve Father's claim that he did not know about Mother's drug use or past neglect. Thus, we hold that the trial court could properly determine that the clear and convincing standard was met.

**2. Substantial Evidence Supported the Trial Court's Conclusion that Father Was Unlikely to Properly Parent the Children in the Foreseeable Future**

{64} Father argues, also pursuant to *Alicia P.,* 1999–NMCA–098, that the trial court erred in finding that the causes and conditions that led to the taking of the Children into custody had not been or would not be alleviated in the foreseeable future. Father contends that the trial court improperly

relied on evidence of past problems and generalizations about the future in finding that the conditions and causes of the abuse and neglect were unlikely to change.

{65} To the contrary, the trial court's finding was not based on stale evidence unrelated to current parenting problems or on generalizations about the future. Rather, the likelihood of Father being able to parent the Children in the foreseeable future was made by the trial court based on all the evidence placed before it. That evidence included the following. Father neglected the Children by leaving them in the care of Mother, whom he knew used drugs and had a history of neglecting her children. Father previously had his parental rights terminated to another child under similar circumstances. Father had an opportunity to parent the Children while on probation but never functioned as a primary caretaker. Father continued to ignore his parental responsibilities while incarcerated by making no efforts to contact the Children or provide for them. The Children, who were severely damaged by parental neglect, did not remember Father. Father denied a history of drug use and domestic violence on the part of both parents and claimed he did not appreciate how badly damaged the Children were until the end. In this case, "there is a very real relationship between the past conduct and the current abilities." *State ex rel. Children, Youth & Families Dep't v. Amy B.,* ¶ 16, 2003–NMCA–017, 133 N.M. 136, 61 P.3d 845. The trial court properly determined that Father's past conduct was relevant to his ability to parent the Children in the foreseeable future. *See Eventyr J.,* 120 N.M. at 469, 902 P.2d at 1072.

{66} The trial court also properly considered the physical, mental, and emotional welfare and needs of the Children in determining their need for permanency. *Mafin M.,* 2003–NMSC–015, ¶ 24 ("When balancing the interests of parents and children, the court is not required to place the children indefinitely in a legal holding pattern, when doing so would be detrimental to the children's interests." (internal quotation marks and citation omitted)). Father was incarcerated during most of the proceedings. Upon his release,

he was paroled to Florida. The trial court heard testimony from several witnesses that it would be very difficult for the Children to move to Florida given their extreme needs and lack of relationship with Father. Thus, substantial uncertainty surrounded Father's ability to parent the Children in the foreseeable future. Because any further delays in the proceedings threatened the welfare of the Children, the trial court was not obligated to wait indefinitely for Father to resolve the issues that caused the abuse and neglect. *See id.* Therefore, clear and convincing evidence supported the trial court's determination that Father was unlikely to be able to properly parent the Children in the foreseeable future.

### 3. Substantial Evidence Supports a Finding of Reasonable Efforts

{67} Father argues that the Department failed to show that it made reasonable efforts to assist Father in adjusting the conditions which rendered him unable to properly care for the Children. Specifically, Father argues that the Department did not make reasonable efforts to reunify the family and facilitate a bond between Father and the Children while he was incarcerated.

{68} The Department first responds that no reasonable efforts were required based on the trial court's findings of abandonment and aggravated circumstances. We find it unnecessary to dismiss Father's claim on that basis. Regardless of whether reasonable efforts were required, we agree with the Department that clear and convincing evidence supports the trial court on this finding.

{69} We find no support in the record for Father's argument that once he was incarcerated, the Department basically abandoned him, offering no services and doing nothing to facilitate visitation with the Children. To the contrary, the Department maintained a permanency plan of reunification with a concurrent plan of placement with relatives throughout Father's incarceration. The Department made reasonable efforts to assist Father prior to filing its motion for termination of parental rights by maintaining contact with Father both directly and through counsel, informing Father of the Children's problems and treatment, and visiting Father at his place of incarceration with an interpreter to obtain a psychosocial evaluation. At Father's request, the Department requested a home study of Father's relatives in Florida. Father was encouraged to write to the Children and later to send taped messages. Father and his counsel were both given the opportunity to participate in treatment team meetings. The Department used the assistance of a Spanish-speaking social worker who met with Father in prison and on the telephone.

{70} The ultimate failure to reach the goal of reunification or placement with relatives was not due to the Department's lack of efforts. Witnesses testified that placing the Children with relatives out-of-state would be detrimental to their welfare. Based on clinical recommendations, the Department determined it was not appropriate for the Children to visit Father because he was incarcerated, the Children did not remember him, and the Children were severely damaged in part because of his inadequate parenting. *See Maria C.,* 2004–NMCA–083, ¶ 43 (indicating that the district court allowed the Department discretion in visitation matters). Not only did Father choose not to write to the Children, but in all his appearances before the trial court, he did not once ask to see the Children until the final hearing on termination. *See id.* ¶ 33 (stating that parents might be able to invoke the discretion of the court to obtain visitation or reinstate contact with their children to increase their chances of reunification).

{71} We also are not persuaded that the Department failed to make reasonable efforts once Father was paroled. Father was told that at a minimum he should participate in treatment team meetings by telephone, but he made no efforts. His counsel was invited to attend but she did not. The record also indicates that the Department attempted to maintain contact with Father by telephone. Ultimately, it was Father's incarceration and subsequent parole and the failure to find suitable placement with relatives that made reunification impossible. Based on these circumstances, we reject Father's argument

that the Department failed to make reasonable efforts to assist him.

#### 4. Department Presented Clear and Convincing Evidence of Abandonment

{72} Father argues that the Department did not present clear and convincing evidence that Father abandoned the Children. Father advances this argument pursuant to *Alicia P.*, 1999–NMCA–098. We are not persuaded.

{73} The two-part test for abandonment requires proof of a "conscious disregard of parental obligation and evidence that the parent-child relationship was destroyed by the parental conduct." *See State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997–NMSC–038, ¶ 14, 123 N.M. 711, 945 P.2d 76 (internal quotation marks and citation omitted). Substantial evidence supports a finding that Father disregarded the Children's welfare. Father left the Children in the care of Mother, whom Father knew abused drugs and had neglected her children. He offered very little support to Children before becoming incarcerated and then squandered any opportunity to be present in their lives by violating probation and becoming incarcerated. While in prison, Father made no attempts to contact or support the Children or to ensure their safety.

{74} Substantial evidence supports a finding that the parent-child relationship was destroyed by Father's conduct. Even before he was incarcerated, Father was no longer living with the Children. When Father was incarcerated, the Children were very young. Several witnesses testified that the Children had no memory of Father. Witnesses also testified that the Children were severely damaged by their poor parenting. Both Children suffered from RAD, which manifests in extreme behavioral problems. Therapists testified that RAD, which occurs when children cannot bond with adults, is caused by poor parenting.

{75} We reject Father's assertion that Father's desire to place the Children with his relatives rebutted a presumption of abandonment and that the Department contributed to the disintegration of the parent-child bond by not following through on Father's wishes. Father did not request that the Children be placed with his relatives until the Children were taken into the custody of the Department, which was long after he had removed himself from the Children's lives. We recognize that in some situations, an incarcerated parent may be able to provide for his or her children. *See id.* ¶ 17 (acknowledging that family might help raise a child whose parent is in prison while facilitating a continuing relationship between the child and the parent). However, in this case, the damage was already done by the time Father went to prison. A bond did not exist. Nonetheless, the Department did not give up on Father simply because he was in prison. The Department pursued a goal of reunification and a concurrent goal of placement with relatives. The Department explored ways to re-establish a relationship between Father and the Children by suggesting that Father write to the Children or send taped messages. The Department followed through on the home study until it became apparent that reunification was unrealistic and placement with relatives would be detrimental to the Children's best interest. Although Father testified that he wanted custody of the Children, testimony was introduced that questioned whether Father wanted to be the primary caretaker or simply make sure the Children remained with his family. *See In re R.W.*, 108 N.M. at 335, 772 P.2d at 369 (stating that the trial court is in a better position than the appellate court "to weigh conflicting evidence and decide where the truth lies"). Given Father's unavailability, and his long history of failing to act as a primary caretaker, the trial court could properly conclude that clear and convincing evidence existed that Father abandoned the Children through a conscious disregard of his parental obligations and the failure to establish any relationship with the Children.

#### 5. Substantial Evidence Supported the Trial Court's Finding of Aggravated Circumstances

{76} Father argues that the Department failed to present clear and convincing evidence of aggravated circumstances. We disagree.

{77} In some cases involving termination on grounds of abuse and neglect, the court may find that efforts by the Department are unnecessary when "the parent has subjected the child to aggravated circumstances." Section 32A–4–28(B)(2)(b). " '[A]ggravated circumstances' include those circumstances in which the parent … has[ ] had his [or her] parental rights over a sibling of the child terminated involuntarily[.]" NMSA 1978, § 32A–4–2(C)(4) (1999). Our cases have recognized, however, that a trial court would likely abuse its discretion if it terminated the parental rights of a person solely on the basis of a parental rights termination that occurred long ago if there is no relationship between past conduct and current abilities to parent. *Amy B.*, 2003–NMCA–017, ¶ 15.

{78} Although Father argues that the trial court's finding of aggravated circumstances was based on Father's relinquishment of his rights to his daughter Rosa, the record and the trial court's judgment indicate otherwise. The Department introduced into the record the previous judgment terminating Father's parental rights to Tremane and argued that it occurred under similar circumstances involving drugs and criminal activity. Based on the judgment involving Tremane, the trial court found that Father had his parental rights terminated involuntarily to another child. The trial court found that the cases were similar because Father left the children in the care of another, was involved in criminal activity, and became unavailable due to his subsequent incarceration. In both cases, substance abuse was present in the home and Father failed to maintain a relationship with the children. Thus, the trial court found that Father neglected the Children through the same kind of conduct that led to the termination of his rights to Tremane. The court therefore properly found that aggravated circumstances existed and that further efforts to assist Father were unnecessary.

## CONCLUSION

{79} We conclude that the trial court did not violate Father's due process rights when it terminated his parental rights and that Father was not denied effective assistance of counsel. We also conclude that Father's pa-

rental rights were terminated only after the Department presented clear and convincing evidence to support the termination. Accordingly, we affirm the trial court.

{80} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge, and IRA ROBINSON, Judge.