2008-NMCA-079

185 P.3d 1072

**STATE of NEW MEXICO, ex rel. CHILDREN, YOUTH AND FAMILIES DEPARTMENT, Petitioner–Appellee,**

v.

**HECTOR C., Respondent–Appellant.**

**In the Matter of Magdalena M., Hector C. JR., and Xavier C., Children.**

**No. 26,807.**

Court of Appeals of New Mexico.

March 4, 2008.

Certiorari Denied, No. 31,012, April 30, 2008.

New Mexico Children, Youth and Families Department, Rebecca J. Liggett, Children's Court Attorney, Santa Fe, NM, for Appellee.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Appellant.

## OPINION

KENNEDY, Judge.

{1} Father's parental rights to his two biological children, Xavier and Hector Jr., were terminated by the district court pursuant to NMSA 1978, §§ 32A–4–28(B)(2), (B)(3) (2005). A third child, Magdalena, shares a biological mother with Xavier and Hector Jr. but is not Father's biological daughter. The district court determined that Father had no parental rights to Magdalena and terminated any of Father's remaining rights to her. We refer to Xavier, Hector Jr., and Magdalena collectively as the children. Father appeals the termination, arguing that the record is insufficient to support, by clear and convincing evidence, that (1) the causes and conditions of the neglect were unlikely to change in the future, (2) the New Mexico Children, Youth and Families Department (CYFD) made reasonable efforts to assist him in remedying the causes of his neglect of the children, and (3) he presumptively abandoned his children. Our review of the evidence does not support the district court's findings of fact that the causes and conditions of neglect were unlikely to change in the foreseeable future. However, we affirm the termination of Father's parental rights based on presumptive abandonment.

## FACTS AND PROCEDURAL HISTORY

{2} CYFD took custody of the children on January 13, 2004, after Kristy M. (Mother) left them with a friend. The friend then left the children with a neighbor, who called CYFD because she was unsure of how to deal with Xavier's physical condition. Xavier was taken to the hospital, exhibiting red

sores, scabs, bruises, redness, and swelling; he was also vomiting and suffering from diarrhea.

{3} The next day, CYFD filed a petition alleging that Mother and Father had abused or neglected the children. Father was incarcerated at the time the children were taken into CYFD custody, and he was served with the petition for abuse or neglect on May 4, 2004. At that time, Father expressed a preference that Xavier and Hector Jr. be placed with his sister. Father was incarcerated for receiving stolen property and tampering with evidence when Xavier was four months old and Hector Jr. was two years old. Father had not been with the children since one month before Xavier was born. Magdalena was placed with her maternal grandmother, and Xavier and Hector Jr. were placed with a foster family.

{4} On May 26, 2004, an initial judicial review hearing was held, and a treatment plan was approved. The treatment plan sought reunification between Xavier, Hector Jr., Magdalena, and Mother and Father. The treatment plan noted that Father was incarcerated but willing to work the treatment plan in order to get the children back. The treatment plan further noted that CYFD was working to place Xavier and Hector Jr. with a paternal aunt but that such placement had not yet happened. It was later determined that placing Xavier and Hector Jr. with the paternal aunt would put them in danger. The family treatment plan noted that Father was to have visits with the children while he was incarcerated but that the visits would be at CYFD's discretion. Father's treatment plan consisted of a psychological exam, a goal of becoming a law-abiding citizen upon release, a goal of remaining drug-free upon release, increasing parenting skills while incarcerated by completing parenting classes, attending individual and/or family counseling while incarcerated and upon release, and providing a stable and safe home for the children.

{5} The district court held an adjudicatory hearing on the neglect petition on July 21, 2004. Prior to the hearing, CYFD amended the original petition to remove any allegation of abuse, alleging only neglect as to Father. The court found that Father was unable to discharge his responsibilities for the children because of his incarceration and that the children were neglected under NMSA 1978, § 32A–4–2(E)(4) (1999).

{6} During his incarceration and after the adjudication of neglect, Father asked about the welfare of his children. CYFD had a counselor contact Father to determine if CYFD could provide services to assist in Father's compliance with his treatment plan. CYFD did not provide services relating to the reunification of Father and his children because of Father's isolation, depression issues, and gang issues. Father was in segregation from the rest of the prison population because he was in danger from the prison gangs, having been labeled a "snitch." Father was in counseling for his depression and substance abuse issues. Because of Father's segregated status, depression, and substance abuse, the services that CYFD could have provided for Father were not appropriate.

{7} According to a pre-dispositional report and treatment plan for Father entered on August 4, 2004, Father had not seen the children since before CYFD had taken them into custody. The report also noted that Xavier and Hector Jr. had bonded well with the foster family and that Xavier's health-related conditions were improving. According to a treatment plan entered on September 24, 2004, and findings contained in an initial judicial review order entered on November 10, 2004, Father was noncompliant with the treatment plan because of his incarceration.

{8} CYFD provided for two visits between Father and Xavier and Hector Jr. while Father was incarcerated. These visits were discontinued when CYFD determined that the visits were traumatic for Xavier and Hector Jr. Father wrote to Xavier and Hector Jr. a total of five times from January 2004 until his release in November 2005.

{9} Before Father's release from prison, the children's permanency plan was changed from reunification to adoption. On the same day, CYFD filed a motion for termination of parental rights. Father filed a motion opposing the termination of his parental rights. After Father's release, another periodic judicial review performed on January 18, 2006, found that Father had not made any prog-

**226**

ress on his treatment plan "[d]ue to incarceration and gang affiliation" and attributed such lack of progress to his depression. Father's parental rights were terminated on April 21, 2006.

## DISCUSSION

### Magdalena

{10} Father does not argue that the district court erred in determining that Father did not have any rights, parental or otherwise, to Magdalena, pursuant to *A.C. v. C.B.*, 113 N.M. 581, 829 P.2d 660 (Ct.App.1992) and *In re Adoption of Francisco A.*, 116 N.M. 708, 866 P.2d 1175 (Ct.App.1993). We do not address arguments not raised on appeal. *See In re Doe*, 98 N.M. 540, 541, 650 P.2d 824, 825 (1982). Accordingly, we affirm the district court's disposition as to Magdalena. We turn to Father's arguments regarding the district court's findings of fact and conclusions of law involving Xavier and Hector Jr.

### Standard of Review

{11} Terminating parental rights implicates rights of fundamental importance. *In re Michael R.C.*, 1999–NMCA–036, ¶ 26, 126 N.M. 760, 975 P.2d 373; *State ex rel. Dep't of Human Servs. v. Natural Mother*, 96 N.M. 677, 679, 634 P.2d 699, 701 (Ct.App. 1981). As such, the grounds for termination must be proved by clear and convincing evidence. *State ex rel. Children, Youth & Families Dep't v. William M.*, 2007–NMCA–055, ¶ 59, 141 N.M. 765, 161 P.3d 262; *Natural Mother*, 96 N.M. at 679, 634 P.2d at 701. We will uphold the district court's judgment "if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly determine that the clear and convincing standard was met." *In re Candice Y.*, 2000–NMCA–035, ¶ 10, 128 N.M. 813, 999 P.2d 1045 (internal quotation marks and citation omitted).

> The clear and convincing evidence standard requires proof stronger than a mere "preponderance" and yet something less than "beyond a reasonable doubt."
>
> For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.

*In re Adoption of Doe*, 100 N.M. 764, 767, 676 P.2d 1329, 1332 (1984) (citation omitted).

{12} CYFD must show that termination of parental rights is in the best interests of the child. *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002–NMCA–061, ¶ 21, 132 N.M. 299, 47 P.3d 859. "However, the termination of parental rights cannot be based on a best interests determination alone. The fact that a child might be better off in a different environment is not a basis for termination of parental rights in this state." *Id.* (internal quotation marks and citations omitted).

### Neglect

{13} Father does not contest that his children were neglected as required by the Abuse and Neglect Act. Father argues that clear and convincing evidence did not exist to prove that the causes and conditions of the neglect were unlikely to change in the future. Father further argues that CYFD did not make reasonable efforts, as required by statute, to assist him in adjusting the conditions that rendered him unable to care for the children.

> Section 32A–4–28(B)(2) provides that termination based on neglect requires the court to find that "the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child."

*In re Michael R.C.*, 1999–NMCA–036, ¶ 23, 126 N.M. 760, 975 P.2d 373.

{14} Father was found to have neglected the children on the basis of his incarceration. The district court found that Father was unlikely to resolve the causes and conditions of his neglect of the children in the foreseeable future. Further, the district court found that CYFD exercised reasonable efforts toward reunifying the children with Father.

### Foreseeable Future

{15} Father argues that the district court improperly relied on evidence of Father's previous drug addiction and gang affiliation to support the termination of his parental rights. Father argues that "[e]vidence of past problems" and "generalizations about the future" are not enough to support termination of parental rights. We find this case to be analogous to our opinion in *Natural Mother*. In *Natural Mother*, this Court found that the information used to evaluate the continuing conditions and causes of neglect was stale and thus not useful in the proceedings to terminate the mother's parental rights. 96 N.M. at 679, 634 P.2d at 701.

{16} Like the evidence in *Natural Mother*, evidence presented to the district court in this case pertained to the parents, children, and their homes during the period when Father was incarcerated. *See id.* "[T]hat evidence was stale for the purpose of determining whether those conditions persisted at the time of the hearing or would persist into the future." *Id.*

The statute requires that "the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child." Undoubtedly, the [district] court made every effort to comply with this proviso. But this cannot be done to the utter exclusion of consideration of the rights of a parent to raise h[is] children. This proviso cannot be read to mean that the children are entitled to a "better" environment than that provided by [Father], if the one provided by [Father] is acceptable to society.

*Id.* at 681, 634 P.2d at 703. Furthermore, making a determination to terminate parental rights "does not include a comparison of the relative merits of the environments provided by the foster parents and by the natural parents." *Id.* at 679, 634 P.2d at 701.

{17} After Father's release from prison, he participated willingly, voluntarily, and enthusiastically in all the programs that CYFD recommended. Father made substantial changes in his life after his release from prison to ensure the return of his children. Specifically, Father attended classes in anger management, life skills, parenting, and substance abuse. Father testified that he began work at a local supermarket, training to be a butcher. Father also testified that he was living with his mother and that he considered his co-workers to be friends, giving him a support system. Father admitted to the district court that he was aware that he needed to work to be a good father. Father voluntarily attended counseling more than mandated and did so with a positive attitude. Father's urinalysis through the community corrections program never showed positive for drug use. Crystal Little, a substance abuse associate working with Father since his release, testified that his chances for success in not going back to a life of drugs were high because he was happy at his job and had a good support system. Kelly Eck, Father's parole supervisor, testified that Father did not have any non-compliance issues with his parole and that his prognosis was good.

{18} The children's counselor, Jennifer Johnston, testified about the children's bond with the foster parents versus their bond with Father. However, we consider this testimony within the context of the case—Hector Jr. was a little over two years old and Xavier was nine months old when taken into CYFD custody. They were placed in the foster home shortly after, and remained there until the termination trial more than two years later. Given the young age of the children and the long time period spent with the foster family, we do not find much support for the finding of neglect in Johnston's testimony. Father's situation was largely a blank slate until his release from prison.

{19} Other testimony at the termination trial included the children's counselor, the CYFD caseworker, and two psychologists. Noah Kaufman, a Ph.D. psychologist, testified that based on his evaluation of Father and based on his history, Father would not be able to resolve the causes and conditions of neglect. However, Kaufman also testified that he had met with Father while he was incarcerated. On cross-examination, Kaufman admitted that he was not aware of how the children were brought into CYFD custody and that he did not know the basis of the initial neglect adjudication. Kaufman testified that he would not be able to change his

opinion unless he knew what Father's personal support system consisted of, what Father's plans were for the future, what exposures Father had to bad influences, and what Father's stress level was. Kaufman stated that Father's history placed him at a very high risk, leaving Kaufman with questions about whether Father has the ability to solve problems and function responsibly. Kaufman's opinion was directed to the past, recounting only Father's history, including Father not being responsive to past incarceration or rehabilitation, and indicating that a person's history is the biggest risk factor. No effort was made by CYFD to present an opinion, through Kaufman or any other witness, based on Father's current situation and on new information that had become available since Kaufman's evaluation.

{20} Although we recognize CYFD's duty to expeditiously handle cases such as this, we are troubled that Father was not reevaluated in light of his positive improvements upon his release from prison. We further recognize that the motion for termination of parental rights (TPR) was filed before Father's release, which may have played a role in how the TPR trial was set up. However, we cannot discount the fundamental importance of parental rights. "It is beyond dispute that the termination of parental rights implicates a significant deprivation of a liberty." *In re Michael R.C.*, 1999–NMCA–036, ¶ 26, 126 N.M. 760, 975 P.2d 373. We reiterate that CYFD made no effort to reevaluate Father. As a result, given Father's complete compliance with the treatment plan and significant progress towards change, we cannot say that CYFD presented clear and convincing evidence at the trial to show that the causes and conditions of the neglect were unlikely to change in the foreseeable future.

{21} This case is unique in that Father's incarceration played an overwhelming and singular role in the termination proceedings. While Father was incarcerated, the children were in a stable, loving environment and had bonded both emotionally and psychologically with the foster parents. Yet once released, Father made commendable efforts to steer clear of his past gang life, stay drug-free, find stable employment, and surround himself with a support group—all efforts to get his children back. *Cf. State ex rel. Children,*

*Youth & Families Dep't v. Athena H.,* 2006–NMCA–113, ¶¶ 9, 12, 140 N.M. 390, 142 P.3d 978 ("However, compliance with the terms of a treatment plan is not dispositive of the issue of parental termination. Even with a parent's reasonable efforts, ... the parent may not be able to make the changes necessary to rectify the causes and conditions of the neglect and abuse so as to enable the court to conclude that the parent is able to properly care for the child."). Nevertheless, we do not find this case so analogous to other cases in which termination of parental rights based on neglect was affirmed. For example, in *State ex rel. Children, Youth & Families Department v. Tammy S.,* 1999–NMCA–009, ¶¶ 13–15, 126 N.M. 664, 974 P.2d 158, we affirmed the father's termination of parental rights based on his failure to comply with the treatment plan in any meaningful manner, his transience, his lack of cooperation with CYFD, and his failure to communicate.

{22} This case is also distinguished from another case in which the father made arguments parallel to those made by Father here regarding the district court's reliance on evidence of past problems. *See William M.,* 2007–NMCA–055, ¶ 64, 141 N.M. 765, 161 P.3d 262. This Court found fault with the father's actions in that case, including the following.

> [The f]ather neglected the [c]hildren by leaving them in the care of [the m]other, whom he knew used drugs and had a history of neglecting her children. [The f]ather previously had his parental rights terminated to another child under similar circumstances. [The f]ather had an opportunity to parent the [c]hildren while on probation but never functioned as a primary caretaker. [The f]ather continued to ignore his parental responsibilities while incarcerated by making no efforts to contact the [c]hildren or provide for them. The [c]hildren, who were severely damaged by parental neglect, did not remember [the f]ather. [The f]ather denied a history of drug use and domestic violence on the part of both parents and claimed he did not appreciate how badly damaged the [c]hildren were until the end. In this case, "there is a very real relationship between the past conduct and the current abilities."

*Id.* ¶ 65 (quoting *State ex rel. Children, Youth & Families Dep't v. Amy B.*, 2003–NMCA–017, ¶ 16, 133 N.M. 136, 61 P.3d 845). We do not believe that Father's past conduct and his current abilities to parent Xavier and Hector Jr. correspond to a degenerated relationship comparable to that in *William M.*

{23} Father argues that his incarceration alone should not be the basis for termination of his parental rights because this state recognizes that incarceration alone is not enough to support an adjudication of neglect. However, Father fails to recognize his continuing duty to care for the children, regardless of his incarceration. When a parent is incarcerated and unable to fulfill ordinary parental duties, the court should consider whether the parent has pursued other opportunities and avenues that could be available in order to carry out such duties to the best of his or her ability. *See State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997–NMSC–038, ¶ 17, 123 N.M. 711, 945 P.2d 76; *William M.*, 2007–NMCA–055, ¶ 63, 141 N.M. 765, 161 P.3d 262. While Father did mention to CYFD that he was interested in having the children placed with their paternal aunt, CYFD determined that such placement was not suitable. Father did not make any additional arrangements for proper care of his children. Regardless of whether Father provided care for the children while he was incarcerated, however, we hold that there was not clear and convincing evidence to support the conclusion that the causes and conditions of neglect were unlikely to change in the foreseeable future.

**Reasonable Efforts by CYFD**

{24} CYFD is charged with making "reasonable efforts to assist the parent in adjusting the conditions which render that parent unable to properly care for the child." *Natural Mother*, 96 N.M. at 680, 634 P.2d at 702 (internal quotation marks omitted). "What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Patricia H.*, 2002–NMCA–061, ¶ 23, 132 N.M. 299, 47 P.3d 859. "CYFD must provide reasonable efforts to assist the parent to change the conditions that gave rise to the neglect . . ., and the district court must consider the results of CYFD's efforts." *Athena H.*, 2006–NMCA–113, ¶ 9, 140 N.M. 390, 142 P.3d 978.

{25} CYFD instituted the termination proceedings before Father was released from jail. Father was unable to participate in any treatment for the benefit of reunification while he was incarcerated, mostly because of the conditions of Father's incarceration. The children were brought to prison twice to visit Father, and it was found that those visits were harmful to the children, causing CYFD to end the visits. Father's incarceration thus complicated both his access to treatment and his relationship with the children.

{26} In *Patricia H.*, this Court noted that the amount of time that constituted reasonable efforts has changed based on changes in federal legislation. 2002–NMCA–061, ¶¶ 24–25, 132 N.M. 299, 47 P.3d 859. We noted that the passing of the Adoption and Safe Families Act (ASFA) "encourages states to move more quickly to terminate parental rights." *Id.* ¶ 26. A fifteen-month window was the suggested time in which reunification would be reasonable following the placement of a child with a substitute family. *Id.* CYFD maintained a permanency plan of reunification throughout Father's incarceration. CYFD attempted to arrange for visits between the children and Father while he was incarcerated. CYFD was prepared to offer services for Father, but it was determined that those services would be inappropriate because Father needed to work primarily on his own issues. CYFD also provided a psychological exam for Father while he was incarcerated. Once Father was released, CYFD provided many services to Father, including parenting classes, individual family counseling, substance abuse counseling, and therapeutic visits between Father and the children.

{27} We find CYFD's efforts in this case to be similar to efforts made in *William M.* Like *William M.*, "[t]he ultimate failure to reach the goal of reunification or placement with relatives was not due to [CYFD's] lack of efforts." 2007–NMCA–055, ¶ 70, 141 N.M. 765, 161 P.3d 262. As was the case in *William M.*, CYFD determined that placing Xa-

vier and Hector Jr. with the paternal aunt would be detrimental to their well-being. It was further determined that it would be inappropriate to take Xavier and Hector Jr. to visit Father because of their fears associated with jail and the fact that they did not remember Father at that time. Ultimately, it was Father's inability to work the treatment plan while he was incarcerated and the failure to adequately place Xavier and Hector Jr. with relatives that made the reunification impossible. *See id.* ¶ 71. Therefore, we hold that clear and convincing evidence existed to prove that CYFD made reasonable efforts to assist Father.

**Presumptive Abandonment Has Been Established and Was Not Rebutted by Father**

{28} Section 32A-4-28(B)(3) provides that the court shall terminate parental rights if it finds that the child has been presumptively abandoned. The statute allows termination of parental rights based on presumptive abandonment if

> the child has been placed in the care of others, including care by other relatives, either by a court order or otherwise and the following conditions exist: (a) the child has lived in the home of others for an extended period of time; (b) the parent-child relationship has disintegrated; (c) a psychological parent-child relationship has developed between the substitute family and the child; (d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent; (e) the substitute family desired to adopt the child; and (f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.

*Id.*

{29} Father challenges the district court's conclusion that the children were presumptively abandoned and argues that incarceration alone is not enough to support the conclusion. Father specifically challenges the district court's finding that the parent-child relationship disintegrated and argues that if the relationship had disintegrated, it was through the fault of CYFD.

{30} The district court concluded that the parent-child relationship between Father and Hector Jr. had disintegrated and that a parent-child relationship between Father and Xavier had never existed. We hold that there is clear and convincing evidence to support that conclusion. Father never had a chance to form a parent-child bond with Xavier. One month before Xavier was born, Father left the family and was later incarcerated. Hector Jr. was just over sixteen months old when Father left the family.

{31} Jennifer Johnston, Xavier's and Hector Jr.'s counselor, testified that both children considered their foster parents to be their mother and father. She further testified that Xavier and Hector Jr. referred to Father as "the other Hector." Xavier and Hector Jr. both experienced some behavioral problems, particularly aggressiveness, after visits with Father and expressed nervousness by pointing to a nervous/worried face on a feelings chart provided by Johnston. Johnston's opinion was that the best place for Xavier and Hector Jr. was with the foster family and that to remove them would be devastating.

{32} Psychologist Marc Caplan, Ph.D., also testified at the TPR trial, stating that Xavier and Hector Jr. were very much bonded with the foster parents. He testified that he considered the foster parents to be the psychological parents and that they were the only parents that Xavier knew. He observed that when Hector Jr. was asked how many moms and dads he had, he responded that he had one mom and one dad, referring to the foster parents. Caplan testified that although Xavier and Hector Jr. were comfortable with Father and that Father appropriately related to them, Father represented an attachment figure in their lives and did not represent a parent.

{33} Father peripherally argues that it was not his actions that caused the disintegration of the parent-child relationship, and therefore, clear and convincing evidence does not exist to find presumptive abandonment. Father relies on *In re J.J.B.*, 119 N.M. 638, 649, 894 P.2d 994, 1005 (1995) for the proposition that it must be the parent's conduct that results in abandonment. While we agree with Father that it must be the parent's actions that caused the disintegration of

the parent-child relationship, we cannot agree that it was CYFD's actions that caused the disintegration in this case.

{34} Our Supreme Court, in *In re J.J.B.*, identified a situation very similar to the one presented here in which disintegration of the parent-child relationship could be assumed.

[I]t may be that the state will temporarily remove the child from the parent's home because the parent has neglected or abused the child. Thereafter, the parent may continue to demonstrate disregard for his or her parental duties by failing to maintain personal contact with the child. Eventually the child quite naturally may develop a psychological parent-child relationship with his substitute caregivers. Under such circumstances it is highly probable that the parent has exhibited a conscious disregard for his or her parental obligations. Further, it can be argued that the parent's conduct has caused the disintegration of the parent-child relationship.

*Id.*

{35} In this case, Father left the family even before Xavier was born. There is nothing in the record to suggest that Father stayed in contact with Xavier or Hector Jr. prior to being served with the abuse or neglect petition when Father discovered that Mother abandoned the children. Father only wrote to Xavier and Hector Jr. five times while he was incarcerated. He was only able to visit Xavier and Hector Jr. twice before CYFD stopped the visits because they were harmful for the boys. Although Father sought to have Xavier and Hector Jr. placed with his sister, CYFD determined that the placement was inappropriate, and Father made no more efforts to have the boys placed with any other relative. "Extraordinary circumstances arise where, after a long separation between parent and child, the necessary parent-child bond has disintegrated." *State ex rel. Children, Youth & Families Dep't v. Benjamin O.*, 2007–NMCA–070, ¶ 36, 141 N.M. 692, 160 P.3d 601 (citation omitted); *In re Guardianship of Ashleigh R.*, 2002–NMCA–103, ¶ 15, 132 N.M. 772, 55 P.3d 984 ("A parent who is an otherwise fit custodian can be denied custody based on a finding that 'extraordinary circumstances' justify such a decision." (citation omitted)). Furthermore, "[i]t is conceivable that the biological parent, though not unfit and not responsible for the disintegration of the parent-child relationship, may still be incapable of reestablishing the necessary parental bond with the child." *In re J.J.B.*, 119 N.M. at 654, 894 P.2d at 1010. On this basis, and based on the record before us, we conclude that there was clear and convincing evidence to support the district court's termination of Father's parental rights under Section 32A–4–28(B)(3).

## CONCLUSION

{36} We conclude that there was not clear and convincing evidence to terminate Father's parental rights on the basis that the causes and conditions of neglect were unlikely to change in the foreseeable future. However, the district court properly terminated Father's parental rights based on presumptive abandonment. Therefore, we affirm the termination of Father's parental rights.

{37} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO, and IRA ROBINSON, Judges.