# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:_____

Filing Date: __January 6, 2016__

**NO. 34,320**

**STATE OF NEW MEXICO, ex rel.
CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,**

      Petitioner-Appellee,

v.

**NATHAN H.,**

      Respondent-Appellant,

**KATEESHA L.,**

and

**IN THE MATTER OF NYREE H., ADRIAN H., and DESHAUN H.,**

      Children.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Sandra A. Price, District Judge**

New Mexico Children, Youth & Families Department
Charles E. Neelley, Chief Children's Court Attorney
Rebecca J. Liggett, Children's Court Attorney
Kelly P. O'Neill, Children's Court Attorney
Santa Fe, NM

for Appellee

Law Offices of Nancy L. Simmons, PC
Nancy L. Simmons
Albuquerque, NM

for Appellant

Native American Disability Law Center, Inc.
Therese E. Yanan
Farmington, NM

Guardian ad Litem

**OPINION**

**VIGIL, Chief Judge.**

{1}     Father appeals from the district court's judgment terminating his parental rights due to neglect. NMSA 1978, § 32A-4-28(B)(2) (2005). On appeal, Father argues that: (1) the Indian Child Welfare Act (ICWA), 25 U. S. C. §§ 1901 to 1963 (2013) applies and therefore its substantive and procedure standards apply; (2) efforts of the Children, Youth, & Families Department (CYFD) to determine whether the ICWA applies were inadequate; and (3) CYFD did not satisfy its burden of proof to terminate Father's parental rights. Based on our review of the record, we conclude that Father's arguments are unpersuasive and affirm the district court's judgment.

**I.     BACKGROUND**

{2}     Mother and Father have three children who were born September 6, 2006, January 8, 2008, and March 9, 2009. On April 2, 2012, Father was incarcerated due to a probation violation resulting from a child abuse charge and failure to fulfill other conditions. Children remained with Mother. At one point, she asked neighbors to watch Children when she went to work. When Mother did not return for Children, Child Protective Services and law enforcement were called and Children were taken into protective custody. One of the neighbors reported that Children were filthy and often complained about not being fed.

{3} CYFD filed a petition alleging that Children were abused and that the ICWA applied because Children were eligible for enrollment or enrolled in an Indian tribe. CYFD filed an ICWA Notice and sent it to the ICWA unit of the Navajo Children and Family Services. The district court filed an ex parte custody order granting CYFD legal and physical custody until otherwise ordered by the court.

{4} At the custody hearing on April 16, 2012, the district court ordered legal custody over Children continue with CYFD. Parents were ordered to undergo psychological and psychiatric evaluations, and drug and alcohol screening, including possible random urine analysis. Father was released from incarceration in July 2012.

{5} On June 4, 2012, Father pled no contest that he neglected Children, under NMSA 1978, Section 32A-4-2(E)(4) (2009), in that he was unable to discharge his parental responsibilities due to his incarceration. The district court found that the children were subject to the ICWA and made requisite findings pursuant to 25 U. S. C. Section 1912 (d), (e) (2012). The district court also adopted a treatment plan for Father.

{6} An initial review occurred on August 13, 2012. The district court found that Father had made reasonable efforts to follow the treatment plan. Specifically, the district court found that Father had regular contact with CYFD, completed a mental health evaluation and hair follicle test, visited Children weekly and engaged in

2

frequent telephone conversations with Children. Father had contacted Children's therapist and saved money to obtain housing. The district court ordered that the permanency plan be reunification. Prior to the first permanency hearing, Father was incarcerated from October 2012 to February 2013.

{7} At the first permanency hearing on March 25, 2013, the district court found that Father consistently visited Children prior to his incarceration and maintained scheduled phone calls with Children during incarceration. After Father was released, Father did not maintain the same consistency with calling Children, and failed to attend a visit with Children without any communication to CYFD. Father was preparing a trailer as a home for Children prior to his incarceration, but maintained slow progress in repairs after his release. Cottonwood Services assessed Father for his substance abuse in which it recommended that Father engage in outpatient substance abuse counseling at least once a week for twenty-four weeks for his dependence on cannabis and alcohol and individual therapy twice a month with two random urine analysis per month. Prior to incarceration, Father attended two parenting classes and three group and individual sessions, but he was not able to maintain counseling during his incarceration. Father consistently maintained contact with CYFD and remained on probation subject to random urine analysis. The district court ordered that the permanency plan remain reunification.

3

{8}     Father was again incarcerated shortly after the first permanency hearing and was still in custody when the second permanency hearing was held on July 22, 2013. At the hearing, the district court changed the permanency plan from reunification to adoption. The district court found that Father's repeated incarcerations partially prevented his progress in the treatment plan. Father had not completed a parenting program or produced a viable home for Children, and was unable to demonstrate that he had the financial ability to keep Children at home. Father had, however, maintained visits with Children and participated in a treatment team meeting. The district court ordered Children to remain in the legal custody of CYFD.

{9}     On July 29, 2013, CYFD filed a motion to terminate Father's parental rights, and the termination of parental rights trial (TPR) was held on March 17, 2014, concurrent with an additional permanency hearing. The district court found Father had not obtained secure housing, completed the aftercare treatment program, or participated in random drug or alcohol testing during his non-incarceration. Father had also missed several visits with Children when he was not incarcerated and had completed only a minimum number of therapy sessions. Father had, however, completed a thirty-day rehabilitation program at Four Winds, maintained contact with CYFD, and engaged in regular visits with Children during his incarceration. The

4

district court ordered that the permanency plan remain adoption. The district court, however, could not determine whether Children were subject to the ICWA.

{10} The TPR hearing took place on March 17, 2014, and May 5, 2014. Also on May 5, 2014, the district court examined evidence to determine whether the ICWA applied. After hearing testimony on this issue, the district court concluded that the ICWA did not apply because Children are neither enrolled nor eligible to be enrolled in an Indian tribe. The district court further concluded that, based on clear and convincing evidence, termination of Father's parental rights was in the best interest of Children. Father appeals.

## II. DISCUSSION

{11} We first address whether the ICWA applies. Secondly, we determine whether CYFD complied with its statutory duty under NMSA 1978, Section 32A-4-22(I) (2009), to investigate whether the ICWA applies. Finally, we address whether there was clear and convincing evidence to terminate Father's parental rights, pursuant to Section 32A-4-28(B)(2).

## A. Applicability of The ICWA

{12} We review the applicability of the ICWA de novo. *Cherino v. Cherino*, 2008-NMCA-024, ¶ 7, 143 N.M. 452, 176 P.3d 1184 (stating that "the applicability of ICWA requires us to interpret statutory language, which is also subject to de novo

5

review"); *see State ex rel. Children, Youth & Families Dep't v. Marsalee P.*, 2013-NMCA-062, ¶ 12, 302 P.3d 761 (stating that "interpretation of ICWA and its relationship to the Abuse and Neglect Act present questions of law that we review de novo" (alterations, internal quotation marks, and citation omitted)).

{13} We begin with the understanding that when we construe the ICWA, "we must resolve all ambiguities liberally in favor of the Indian parent and the tribe in order to effectuate the purpose of the Act, which is to prevent the unnecessary removal of Indian children." *In re Esther V.*, 2011-NMSC-005, ¶ 19, 149 N.M. 315, 248 P.3d 863. Under its statutory scheme, the "ICWA applies to Indian children regardless of whether they are registered with a tribe." *In re Guardianship of Ashley Elizabeth R.*, 1993-NMCA-129, ¶ 18, 116 N.M. 416, 863 P.2d 451; *see* 25 U.S.C. § 1911 (describing the jurisdiction of Indian tribes over state custody proceedings with Indian children).

{14} An Indian child is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4). Father relies on the second prong because Children are not members of any Indian tribe. The only relevant tribes are the Navajo Nation and the Ute tribe. We will begin with the examination of whether Children are eligible for membership in

6

the Navajo Nation because neither party disputes that Father is a member of the Navajo Nation. Mother is not an enrolled member in any tribe.

{15}    To be eligible for membership in the Navajo Nation, Children must possess one-fourth degree Navajo blood. Navajo Nation Code tit. 1, § 701(C) (2010) ("Children born to any enrolled member of the Navajo Nation shall automatically become members of the Navajo Nation and shall be enrolled, *provided they are at least one-fourth degree Navajo blood*." (emphasis added)). The parties do not dispute that Father has one-fourth degree Navajo blood. Mother's blood contribution to Children is therefore significant in determining whether Children are eligible for membership in the Navajo Nation.

{16}    Susan Frybeck, the permanency planning worker for Children, testified about her investigation of Mother's blood. Frybeck had various conversations with Mother in which Frybeck attempted to obtain information on the maternal grandmother's name, birth date, enrollment status, and the hospital where she was delivered. Mother opposed enrollment for Children. Frybeck, however, received the grandmother's name but obtained an incorrect phone number from Mother. Mother did not provide her birth certificate to CYFD, even though she was asked to do so on at least five different occasions. Frybeck communicated with Mother's adopted great grandmother and received another phone number for the biological maternal grandmother. Frybeck

did not receive any response when she called the number. Mother's adopted great grandmother did not have any information concerning the biological maternal great-grandmother.

{17} Deborah Yost, a CYFD adoption consultant who collaborates with the ICWA unit of the Navajo Children and Family Services, testified that the maternal grandmother must be enrolled in order for Mother to be eligible, to then make Children eligible for membership in the Navajo Nation. The Navajo Nation does not have any record of the maternal grandmother. Yost attempted to call the maternal grandmother, who purportedly lived in Oregon, but no one answered. The great grandmother, who raised Mother, was deceased.

{18} Yost received a letter from the ICWA unit of the Navajo Children and Family Services on April 30, 2014, stating that Children are not eligible based on its research. Yost testified that this correspondence was in response to a letter on March 12, 2014, coinciding with Yost's phone calls to the Navajo Nation of Vital Records.

{19} Based on the difficulties CYFD experienced in receiving evidence on Mother's lineage and the Navajo Nation's determination that Children are ineligible, we hold that Children are not eligible for enrollment with the Navajo Nation. Nevertheless, Father asserts that the status of Children does not need to be certain to implement the ICWA and the district court must only examine whether the ICWA possibly applies,

8

relying on *In re Desiree F.*, 99 Cal. Rptr. 2d 688 (Ct. App. 2000). We conclude that *Desiree F.* does not assist Father. In *Desiree F.*, Picayune Rancheria of the Chukchanski Indians filed a notice of tribal intervention pursuant to 25 U.S.C. § 1911(c) prior to a scheduled permanent plan meeting, but after an order terminating parental rights. *Desiree F.*, 99 Cal. Rptr. 2d at 693. The tribe's moving papers contended that the child was eligible for enrollment; that the tribe was not notified of the dependency proceedings; that the state agency had not complied with the ICWA with respect to the mother and the tribe's rights; and that the tribe sought intervention and placement of the child with her grandmother. *Id.* The tribe enrolled the child as a member once it became aware of her existence and obtained notice of the proceedings, and the court concluded that the tribe's decision on membership and eligibility was determinative and the lack of formal enrollment of the child was the agency's fault, due to its failure to give notice. *Id.* at 695-96. In this case, on the other hand, the Navajo Nation has determined that Children are not eligible for enrollment. *See Montana v. United States*, 450 U.S. 544, 564 (1981) ("[T]he Indian tribes retain their inherent power to determine tribal membership[.]").

{20}     Father further asserts that the Navajo Nation has a second method of enrollment, applications to the Enrollment Screening Committee, which is based on criteria other than vital statistics. According to Yost, Children could be enrolled

through this process, even if the biological parent is not an enrolled member. However, this committee also follows the one-fourth blood quantum requirement. For all the cases where:

> the records of the Navajo Agency do not show that the applicant is of at least one-fourth degree Navajo blood or the applicant does not establish such fact by documentary evidence independent of his own statement, consisting of the affidavits of disinterested persons, certified copies of public or church records, or the like, the Screening Committee shall reject the application.

Navajo Nation Code tit. 1, § 752(B) (2010). Again the evidence fails to satisfy this requirement.

{21} Finally, Father contends that the Children are eligible for membership in the Ute tribe through Mother. It is undisputed that Mother is not an enrolled member of the Ute tribe. Based on the language of 25 U.S.C. § 1903(4), an Indian child must be a member of an Indian tribe or eligible for membership in an Indian tribe and the biological child of a member. *See Marsalee P.*, 2013-NMCA-062, ¶ 21 (construing Indian child as defined in 25 U.S.C. § 1903(4) as "when the child is a member of an Indian tribe or the child is eligible to be a member and is the biological child of a member"). Father does not make any arguments that Mother satisfies the requirements for being a member of the Ute tribe.

10

{22} Moreover, the evidence on Mother's lineage to the Ute tribe is lacking. According to Yost, CYFD does not have any information on how the Mother has any lineage to the Ute tribe or the name of a family member enrolled in the Ute tribe. Frybeck further contacted the Southern Ute tribe with the information she possessed and the tribe stated in its response to this information that the children are not eligible. Father only relies on his testimony that Mother possesses Ute blood and Yost's belief that Mother might be one-eighth Ute. There is no evidence, notwithstanding Father and Yost's belief, to establish Children's lineage to the Ute tribe.

{23} Based on the foregoing reasons, we conclude that the ICWA does not apply to Children, because they are not eligible for membership into either the Navajo Nation or the Ute tribe and therefore do not satisfy the definition of an Indian child as set forth in 25 U.S.C. Section 1903(4).

**B.      Compliance by CYFD with Section 32A-4-22(I)**

{24} Father argues that CYFD's purported efforts did not satisfy the requirements in *Marsalee P.* regarding Section 32A-4-22(I), much less determine the applicability of the ICWA. We therefore must examine whether CYFD's actions met the statutory mandate in Section 32A-4-22(I). In doing so, we review "[t]he interpretation of the

ICWA and its relationship to our state statute on abuse and neglect" de novo. *In re Esther V.*, 2011-NMSC-005, ¶ 14.

{25} Section 32A-4-22(I) states "[w]hen a child is placed in the custody of [CYFD], [CYFD] shall investigate whether the child is eligible for enrollment as a member of an Indian tribe and, if so, [CYFD] shall pursue the enrollment on the child's behalf." Father contends CYFD failed to comply with this statutory mandate.

{26} In *Marsalee P.*, we examined whether CYFD complied with Section 32A-4-22(I). *Marsalee P.*, 2013-NMCA-062, ¶ 25. Neither party disputed that the children were eligible for enrollment in the Navajo Nation. *Id.* ¶ 18. The record contained no evidence that CYFD made any attempts to enroll the children before the trial, and at the time of the trial, CYFD knew the children were eligible. *Id.* ¶ 25. We were unable to determine the extent of CYFD's compliance with Section 32A-4-22(I) prior to the trial. *Marsalee P.*, 2013-NMCA-062, ¶ 25. We therefore held that the district court erred when it terminated the mother's parental rights without requiring CYFD to comply with the statute.

{27} Unlike *Marsalee P.*, the record in this case demonstrates that CYFD conducted an investigation in compliance with Section 32A-4-22(I). CYFD focused on retrieving evidence on Mother's genealogy. CYFD had many conversations with Mother to receive information on her lineage in which Mother was not cooperative.

12

Specifically, Frybeck requested Mother's birth certificate on at least five different occasions, but Mother did not produce the document. Yost testified that she attempted to retrieve Mother's birth certificate from the income support division. Yost contacted the Navajo Nation of Vital Records where it assisted in the investigation on CYFD's behalf. CYFD was informed that the Navajo Nation does not have any record of the maternal grandmother. Yost also made phone calls prior to the ICWA unit of the Navajo Children and Family Services, to determine if Children were eligible. CYFD attempted to reach the grandmother over the phone where it received no response. According to Frybeck, she interviewed the Mother's adopted great grandmother in her home to obtain information on the biological great grandmother, but she did not possess any information.

{28}   CYFD conducted further steps in its investigation. Frybeck attempted to retrieve Father's birth certificate and certificate of Indian blood from Father and the paternal grandmother, but Frybeck did not receive these documents. Frybeck contacted the Southern Ute tribe and described all of the information CYFD had and the tribe responded that based on this information Children are ineligible.

{29}   We hold that under these circumstances, CYFD complied with Section 32A-4-22(I) to investigate whether Children were eligible for enrollment. Father asserts that CYFD should have deposed Mother, subpoenaed the birth records, or conducted other

avenues for its investigation; however, the statute does not require CYFD to implement all possible methods in its investigation. Rather, the language of Section 32A-4-22(I) requires an investigation by CYFD. *Marsalee P.*, 2013-NMCA-062, ¶ 25. Each case must be determined on its own facts. Here, CYFD conducted an adequate investigation based on the evidence which it had.

## C.    The Evidence was Clear and Convincing

{30}    Finally, we next address whether the district court erred when it concluded that there was clear and convincing evidence to terminate Father's parental rights, pursuant to Section 32A-4-28(B)(2). We review the district court's decision for substantial evidence. *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 22, 132 N.M. 299, 47 P.3d 859 ("Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." (internal quotation marks, and citation omitted)).

{31}    In TPRs, the standard of proof is clear and convincing evidence. *State ex rel. Children, Youth & Families Dep't  v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778. Clear and convincing evidence means "evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Lance K.*, 2009-NMCA-054, ¶ 16 (alteration, internal quotation marks, and citation omitted).

14

We examine the evidence in the light most favorable to whether the district court, as the trier of fact, could appropriately conclude that the clear and convincing evidence standard was satisfied. *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066.

{32}    Under Section 32A-4-28(B)(2), the district court was required to find that:

> the child has been a neglected or abused child as defined in the Abuse and Neglect Act and . . . that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

The district court therefore had to make three separate findings: (1) Children were neglected or abused; (2) the conditions and causes of neglect and abuse were unlikely to change in the foreseeable future; and (3) CYFD made reasonable efforts to assist Father in adjusting the conditions that rendered Father unable to properly care for Children. *See Eventyr J.*, 1995-NMCA-087, ¶ 12. On appeal, Father only challenges the district court's conclusion that the conditions and causes were unlikely to change in the foreseeable future.

{33}    The district court's treatment plan ordered Father to engage in certain requirements, including treatment for his substance abuse. The treatment plan required Father to participate in parenting classes, retain stable housing, follow the

15

recommendations from his substance abuse and mental health assessments, and participate in scheduled visits with Children. Father did not comply with these requirements due to his repeated incarcerations.

{34} Father was incarcerated from April 2012 to July 2012 when this case began. Father was again incarcerated from October 2012 to February 2013, because he pleaded guilty to battery upon a police officer. Father also received an unsatisfactory discharge from probation involving his child abandonment conviction prior to this case. Father was again incarcerated from May 11, 2013, to April 22, 2014. Father received new criminal charges in May and he pleaded guilty to auto burglary and receiving stolen property in September 2013. Father's probation involving battery upon a police officer was also revoked in September 2013. At the time of the TPR hearing, Father still had nine months of probation remaining.

{35} The evidence demonstrated that Father's repeated incarcerations affected his treatment plan. Kim DuTremaine, a licensed independent social worker, substance abuse counselor, and an expert witness in substance abuse assessments, psycho-social assessments, recommendations and diagnosis, performed a psycho-social assessment on Father. Because Father had problems with substance dependency and self-medicating behavior, DuTremaine recommended that Father participate in outpatient co-occurring therapy—a substance abuse group session, once a week for six months,

16

and individual sessions twice a month to focus on his anxiety disorder in conjunction with his substance abuse issues. Father only attended three group sessions out of the twenty-four recommended sessions. Father did not meet the recommendations for the group sessions in September 2012 and Father was again incarcerated by October 2012.

{36} In October 2013, Father's addiction severity was re-assessed through DuTremaine's agency as Father had been incarcerated and had failed the treatment plan at a lower level of care. However, DuTremaine's agency determined Father was appropriate for residential treatment. The agency recommended the residential treatment program, followed by intensive outpatient program, and then additional aftercare program. According to DuTremaine, this recommendation would encompass a ten-month period where the intensive outpatient program included individual, family, and group therapy, as well as urine analysis and contingency management. The intensive outpatient program involved at least nine hours per week for a minimum of twelve weeks, and the aftercare program included one day per week for a total of six months. Freybeck testified that Father was released from incarceration to participate in the treatment program at Four Winds on October 8, 2013, and that Father was to return to the detention center after completion. Father completed his inpatient program, but did not complete the intensive outpatient program.

{37}     In regard to Father's attempts to obtain and maintain secure housing, Dianne Grieser testified that Father had lived in her house and that she had offered Father a trailer, which needed significant repair, for Children to live in. According to Grieser, the trailer needed new plumbing, wiring, flooring, and a new furnace. Frybeck testified that the trailer was not appropriate for Children when she last saw it. Father's most current residence did not have the space to allow Children to stay the night.

{38}     Father also did not maintain telephone calls and scheduled visits with Children. Ione Randleman, who was a foster parent for Children from November 2012 to June 2013, testified that when Father was released from incarceration in approximately March 2013, Father, at first, regularly called Children. Father then began to reduce his telephone calls with Children until he stopped calling entirely. Randleman did not know if the decline in phone calls started when Father was once again incarcerated. Randleman also stated that Father missed scheduled visits with Children during his release from incarceration and when Father missed visits, Children would exhibit severe behavior.

{39}     Frybeck also testified that Father did not complete any parenting classes and his repeated incarcerations impeded their completion. Because Father has not accomplished certain requirements—completed parenting classes, maintained a stable home, followed the substance abuse treatment plan, and participated in the scheduled

18

visits with Children—and was repeatedly incarcerated, we hold that there is clear and convincing evidence that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future.

{40} Father nevertheless contends that his situation is similar to *State ex rel. Children, Youth and Families Department v. Hector C.*, 2008-NMCA-079, 144 N.M. 222, 185 P.3d 1072, asserting that past conduct was stale evidence and, therefore, was insufficient to terminate Father's parental rights. In *Hector C.*, the father was incarcerated at the inception of the case in which a motion for termination of parental rights was filed prior to his release. *Id.* ¶¶ 3-9. After the father was released, he attended classes on parenting and substance abuse, worked in a local supermarket, attended more than the required number of counseling sessions, and never tested positive for drug use. *Id.* ¶ 17. The father also did not have non-compliance issues with his parole. *Id.* The father's incarceration for receiving stolen property and tampering with evidence had "played an overwhelming and singular role in the termination proceedings," bypassing the father's current situation. *Id.* ¶ 21. We found *Hector C.* to be analogous with *State ex rel. Department of Human Services v. Natural Mother*, 1981-NMCA-103, 96 N.M. 677, 634 P.2d 699 where we held that the amount of time and considerable changes in the mother's circumstances caused the evidence to be stale concerning whether the conditions would persist in the future.

*Hector C.*, 2008-NMCA-078, ¶ 15 (citing *Natural Mother*, 1981-NMCA-103, ¶ 9). We concluded that the trial court did not have clear and convincing evidence for its finding that the causes and conditions of neglect were unlikely to change in the foreseeable future. *Hector C.*, 2008-NMCA-078, ¶ 23.

{41} However, in this case Father's past conduct is still relevant to his current parental abilities, and to foreseeable events. Unlike *Hector C.* and *Natural Mother*, Father has not changed his situation in any meaningful way. Father has not retained a stable and secure home for Children, completed any parenting classes, or followed the recommendations for treatment on his substance dependency and anxiety disorder. Although Father's repeated incarceration hindered the treatment plan, incarceration does not release Father from following treatment that affects his parental duties to Children. *See Hector C.*, 2008-NMCA-078, ¶ 23 ("Father fails to recognize his continuing duty to care for the children, regardless of his incarceration."). While we recognize that incarceration is not a dispositive legal ground to terminate Father's parental rights, Father's significant substance abuse and criminal issues—for which he was repeatedly incarcerated, provided sufficient evidence that he was unable to care for his children now, and in the foreseeable future. *State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997-NMSC-038, ¶ 11, 123 N.M. 711, 945 P.2d 76. "Parents do not have an unlimited time to rehabilitate and reunite with their children."

20

*State ex rel. Children, Youth & Families Dep't v. Browind C.*, 2007-NMCA-023, ¶ 40, 141 N.M. 166, 152 P.3d 153. (internal quotation marks and citation omitted).

**III.    CONCLUSION**

{42}    For the foregoing reasons, the judgment of the district court is affirmed.

{43}    **IT IS SO ORDERED.**


                                                _____
**MICHAEL E. VIGIL, Chief Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**M. MONICA ZAMORA, Judge**