This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-41891**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

      Petitioner-Appellee,

v.

**ANDREA L.,**

      Respondent-Appellant,

and

**ROBERT G.,**

      Respondent,

**IN THE MATTER OF KAMRI G.,**

      a Child.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jane Shuler Gray, District Court Judge**

Children, Youth & Families Department
Amanda M. Romero, Chief Children's Court Attorney
Albuquerque, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

575 Law Group, LLC
Eileen P. Riordan
Carlsbad, NM

Guardian ad Litem

# DECISION

**MEDINA, Judge.**

**{1}** Andrea L. (Mother) appeals the termination of her parental rights to K.G. (Child). Mother argues that the district court's findings supporting termination of her parental rights were speculative and, as such, there was insufficient evidence to terminate her parental rights. We affirm the judgment of the district court.

## BACKGROUND

**{2}** Child was born on September 17, 2021. Child's father is Robert G. (Father), who is not a party to this appeal. The following facts surrounding Child's placement in Children, Youth & Families Department (CYFD)'s custody were obtained from the affidavit for the ex parte custody order. On April 13, 2022, when Child was approximately seven months old, officers were dispatched to an address associated with Child's aunt (Aunt) in order to conduct a welfare check on Aunt's child. Unable to locate Aunt at the address, the officers drove to Child's maternal grandmother's (Grandmother) house. Upon arrival at Grandmother's house, one of the officers observed Mother and Father "crawl[ing] out of a broken[-]down vehicle in the driveway." Mother told the officer that she had a child in the house but could not grant the officer access to the home because she did not live there.

**{3}** CYFD was contacted and a CYFD investigator, Brandie Medrano, drove to Grandmother's house. When Ms. Medrano arrived, Mother and Father stated no one was in the home with Child. The officer and Ms. Medrano called Grandmother, who returned home and granted the officer access into the house in order to perform a welfare check on Child. Grandmother told the officer that Mother, Father, and Child lived with her. Mother, on the other hand, claimed they were just visiting but refused to provide Ms. Medrano with an address where she resided.

**{4}** Once in the home, Ms. Medrano and the officer found Child sleeping alone on a bed. Ms. Medrano described the condition of the home as "filthy[,] dirty, it had a very foul odor[. T]here was trash and dirty clothes piled up all over the home[. S]ome rooms were so bad you could not even walk through [them. T]here was no baby food in the home[. T]here were extension cords all over the house."

**{5}** Members of Mother's family had a pattern of substantiated allegations of abuse or neglect with CYFD. CYFD recently informed Mother that Grandmother's home was not safe for children. Medrano concluded it would be "contrary to the welfare of . . .

[C]hild to remain in the home" and listed two dangerous indicators: (1) "[i]mminent danger of harm due to failure to meet basic needs"; and (2) "[h]azardous living conditions." CYFD also identified additional risks arising from the family residing in Grandmother's home who despite having been informed that the home is not adequate for children, failed to clean the home.

**{6}** On April 15, 2022, CYFD filed a petition alleging Child was abused and neglected for the following reasons: (1) Child "suffered or [was] at risk of suffering serious harm because of the action or inaction of . . . [C]hild's parents [Mother and Father,] pursuant to [NMSA 1978, Section] 32A-4-2(B)(1) [(2018, amended 2023)]"; and (2) Child was "without proper parental care and control" and was neglected by Mother and Father, contrary to Section 32A-4-2(G)(2). The following day, the district court entered an ex parte custody order placing Child in CYFD's legal custody, subject to judicial review.

**{7}** The district court entered a stipulated judgment and disposition in June 2022, adjudicating Child neglected, pursuant to Section 32A-4-2(G)(2). Mother and Father did not contest the allegations of neglect. The court granted CYFD legal custody of Child for up to two years, subject to judicial review. The stipulated judgment ordered Mother to participate in a treatment plan which included: participating in a mental health assessment and following all recommendations for individual therapy; participating in outpatient or inpatient drug treatment services; participating in a psychological evaluation and following recommendations; participating in random drug screens; participating in scheduled visitation with Child; completing a parenting program; obtaining and maintaining safe and stable housing; maintaining employment in order to provide care for herself and family.

**{8}** On January 19, 2023, the district court held an initial permanency hearing and reviewed Mother's progress on the treatment plan. Mother completed the psychological evaluation, attended the parenting class, and attended visits with Child. However, Mother continued to test positive for methamphetamines, THC (delta-9-tetrahydrocannabinol), and amphetamines and did not address the other items in the treatment plan including finding safe and stable housing and employment. As a result, the district court ordered Child's permanency plan be changed to adoption, as recommended by CYFD, and gave Mother approximately six months to make additional progress on the treatment plan.

**{9}** The following day, CYFD filed a termination of Mother's parental rights (TPR) motion to Child. Hearings were held on April 13, 2023, and July 13, 2023, to review Mother's progress with the treatment plan and Child's permanency plan. In April 2023, Mother completed an inpatient rehabilitation program and maintained her sobriety since completing the program. Following the hearing on July 13, 2023, the district court found Mother needed to next make progress on securing safe and stable housing and employment.

**{10}** After several continuances in the proceedings, on November 30, 2023, CYFD filed a second TPR motion and a hearing was scheduled for January 18, 2024. The

district court continued the January 18, 2024 hearing, because Mother stated she recently moved into her employer's home. The TPR hearing was held on February 8, 2024, in which CYFD presented the following testimony.

**{11}** Mariah Pineda, a permanency planning coordinator with CYFD, testified about Mother's status with the transition plan and stated Mother made progress on many of the items; however, the outstanding concerns were safe and stable housing and employment. Ms. Pineda testified that, throughout the case, Mother lived at Grandmother's house. Ms. Pineda further testified that although "physical [alterations]" were made to the home, the house remained unsafe because there were individuals with previous charges and criminal history who continued to reside in the home.

**{12}** In December 2023, Mother told Ms. Pineda that she moved into the home of her employer, for whom she provided occasional childcare. Ms. Pineda inspected the home and found it to be suitable, but she did not believe Mother lived there full time for the following reasons: there were very few personal items in the bedroom Mother claimed to use; Mother did not provide Ms. Pineda with a rental agreement; Mother told Ms. Pineda that she only lived in the home when her employer was there and he is out of the home for weeks at a time for work. Mother also stated she was recently on a two-week vacation and had not lived at her employer's home for that time. However, Ms. Pineda testified that during the two weeks Mother claimed to be on a vacation, Mother did not miss any visits with Child and Ms. Pineda observed Mother leaving Grandmother's home one morning around 7:45-8:00 a.m. For these reasons, Ms. Pineda believed Mother was still living with Grandmother. Ms. Pineda testified she had no reason to believe Mother would find safe and stable housing in the foreseeable future.

**{13}** In further support of CYFD's belief that Mother had failed to obtain safe and stable housing and was instead continuing to live in Grandmother's home, CYFD presented testimony from Mandy Cutshall, Mother's parenting coach. Ms. Cutshall testified she transported Mother for visitation with Child eight times within a month or two month period. Each time Ms. Cutshall transported Mother to visitations with Child, Ms. Cutshall picked Mother up from Grandmother's home.

**{14}** With regard to the condition that Mother obtain employment, Ms. Pineda testified that she was able to verify two of the three jobs Mother claimed to have. Mother reported to CYFD that she began working with DoorDash in August 2023. Although Mother had vision problems and did not have a license to drive a vehicle, Mother stated that another person would drive her to make deliveries. However, Mother did not provide CYFD with proof of employment for DoorDash. Mother also claimed she worked as a nanny for the employer she claimed to live with. Ms. Pineda testified she received verification from employer in January 2024 that Mother provides childcare some weekends, when he had custody of his children and was not working out of town. Finally, Mother provided CYFD with proof of employment at a senior living center, where she began working less than two weeks before the TPR hearing.

**{15}** Maria Quintana, Child's foster parent, addressed the district court and testified the Child had been with her since April 2022 and that she takes Child to weekly visits with Mother. Ms. Quintana did not believe Child did well after visits with Mother, explaining that after visits with Mother, Child was upset, wanted to be with foster parents, wanted to be held, wanted to sleep with foster parents, and, on one occasion, vomited. Ms. Quintana stated that during the twenty-two months Child lived with them, Child bonded with them and recognizes them as her parents and Quintana's other children as her siblings. During cross-examination, Quintana affirmed that she wishes to adopt Child if she became available.

**{16}** Child's guardian ad litem (Guardian) spoke on behalf of the Child's best interests. Guardian did not believe Mother met the conditions of her treatment plan. First, Guardian emphasized the importance of safe and stable housing, explaining how part-time housing was not stable and stated that Grandmother's home was unacceptable. Next, Guardian was not persuaded Mother met the condition to maintain employment, because Mother did not provide proof of prior claims of employment and her only verified employment began less than two weeks before the hearing.

**{17}** At the conclusion of the TPR hearing, the district court granted CYFD's motion to terminate Mother's parental rights. The district court acknowledged Mother's "efforts on aspects of her [treatment] plan," but explained that Mother had "failed to follow through with recommendations from her psychological evaluation" and "has demonstrated an unwillingness to address her housing issue" and as a result, "[t]he [district] court finds no reason to believe [Mother] will address this issue and obtain safe and stable housing for . . . [C[hild." The district court further found that "[Mother] was aware of the case plan requirement that she obtain safe and stable housing" and that "the home she was living in, and the household members she was living with had been assessed as unsafe and [an] inappropriate living environment for . . . [C]hild." Further, based on the testimony from CYFD's witnesses, the district court found that Mother's testimony was not credible particularly with respect to her claimed living arrangement with employer and DoorDash employment, noting that even if Mother sometimes lived with employer that the arrangement did not provide Child with consistent, stable housing.

**{18}** The district court found that it is likely that Mother would return Child to the home she was removed from if Child were reunified with Mother and the case dismissed. The district court additionally found that Mother had not alleviated the causes and conditions that lead to Child's placement in CYFD custody, did not achieve the goals of her case plan and did not provide a reason to believe Mother would do so in the foreseeable future. In addition to its order, the court issued extensive findings of fact and conclusions of law. This appeal followed.

**DISCUSSION**

**{19}** On appeal, Mother makes two arguments. First, Mother contends the district court's findings regarding Mother's home and employment were speculative and,

second, as a result, those findings did not provide the substantial evidence necessary to terminate Mother's parental rights.

**{20}** The Abuse and Neglect Act (ANA) provides that the district court shall terminate parental rights if

the child has been neglected or abused as defined in the [ANA] and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

NMSA 1978, § 32A-4-28(B)(2). It is CYFD's burden to demonstrate these elements by clear and convincing evidence. *See* NMSA 1978, § 32A-4-29(I) (2022); *see State ex rel. Child., Youth & Fams. Dep't v. Patricia H*., 2002-NMCA-061, ¶ 21, 132 N.M. 299, 47 P.3d 859. When considering the termination of parental rights, the district court is obligated to "give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." Section 32A-4-28(A). "Clear and convincing evidence is defined as evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact-finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Child., Youth & Fams. Dep't v. William C.*, 2017-NMCA-058, ¶ 27, 400 P.3d 266 (alterations, internal quotation marks, and citation omitted); *see State ex rel. Child., Youth & Fams. Dep't v. David F.*, 1996-NMCA-018, ¶ 34, 121 N.M. 341, 911 P.2d 235 (defining clear and convincing evidence as "proof stronger than a mere preponderance and yet something less than beyond a reasonable doubt" (internal quotation marks and citation omitted)).

**{21}** We uphold the district court's termination decision "if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *State ex rel. Child., Youth & Fams. Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted). We give deference to the district court's findings of fact, *see State ex rel. Child., Youth & Fams. Dep't v. Brandy S.*, 2007-NMCA-135, ¶ 17, 142 N.M. 705, 168 P.3d 1129, and are mindful that "[w]e cannot reweigh evidence. Conflicts in testimony are matters for the [district] court to resolve." *State ex rel. Child., Youth & Fams. Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 28, 128 N.M. 701, 997 P.2d 833.

## I.     Sufficient Evidence Supports the District Court's Findings Regarding Housing and Employment

**{22}** Mother argues she met all of the conditions of the treatment plan and the district court's findings that she did not secure housing and employment were both based on speculation. Our review of the record reveals that CYFD presented clear and convincing evidence that Mother failed to obtain and provide safe and stable housing for Child and

to maintain employment of a nature that would enable her to provide care for herself and Child.

**{23}**   With regard to obtaining safe and stable housing, the evidence revealed that, when Mother informed her permanency coordinator she was residing with her employer, the permanency coordinator inspected the residence and saw very few personal items in Mother's bedroom. Moreover, during this time, the evidence revealed that (1) Mother's parent coach picked up Mother at Grandmother's home where Child had been removed from and not at the home of Mother's part-time employer; and Mother's permanency coordinator observed Mother leaving Grandmother's home early one morning. Had Mother been living elsewhere, it is reasonable to conclude that Mother's parent coach would not have been picking mother up at Grandmother's home and Mother's permanency coordinator would not have seen Mother leaving Grandmother's home just before eight o'clock in the morning. Based on this evidence, it was reasonable for the district court to conclude that Mother had not succeeded in attaining safe and stable housing and instead continued to reside in Grandmother's home.

**{24}**   Based on the permanency coordinator's testimony, at best, Mother's housing consisted of possible part-time living arrangements in her employer's home. As the district court found, this did not constitute "consistent [and] stable housing for the [C]hild". Mother's own statements to the permanency coordinator that she only resided at her employer's residence when he had custody or visitation with his children provide additional clear and convincing evidence that Mother had not obtained consistent and stable housing for Child. Notably, Mother never identified where she lived when employer did not have his children.

**{25}**   With regard to Mother's employment, during the TPR hearing, Mother's permanency coordinator concluded that Mother did not prove she maintained employment throughout this case. The evidence revealed that during the two years of these proceedings, Mother occasionally worked as a child caretaker and only provided proof of her employment with a senior living center, less than a couple weeks before the final TPR hearing. As the district court found, Mother "has not demonstrated an ability to maintain stable employment or obtain another source of stable income to provide for her [C]hild through benefits or other resources." While Mother claimed she worked three jobs, Mother's permanency coordinator was able to verify only two of the jobs. CYFD presented clear and convincing evidence that it was unable to verify Mother's employment with DoorDash because Mother failed to provide CYFD with proof of employment. In addition, the evidence revealed that Mother did not have a driver's license. This evidence supports the district court's finding that Mother's claim that she worked for DoorDash lacked credibility.

**{26}**   To the extent Mother appears to be requesting that we disturb the district court's determination that Mother's testimony lacked credibility as to her claimed employment with DoorDash and how she performed the job without a driver's license, we decline to do so because determinations of credibility are for the fact-finder to make. *See State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (observing that New

Mexico appellate courts will not invade the province of the fact-finder's decision concerning the credibility of witnesses).

**{27}** We conclude the district court's findings were not based on speculation and the evidence was sufficient to show Mother failed to obtain safe and stable housing for Child and obtain employment sufficient to provide for herself and Child.

## II. The Evidence Supports the Termination of Mother's Parental Rights

**{28}** Mother's argument that the order terminating her parental rights to Child should be reversed for lack of sufficient evidence is based entirely on her claim that the district court's findings regarding obtaining a home and employment were based on speculation and upon a claim that she successfully addressed the conditions that caused her neglect of Child. Mother does not challenge the district court's finding that Child was abused or neglected or that CYFD made reasonable efforts to assist her in adjusting the conditions that rendered her unable to properly care for Child. Instead, Mother asserts that the district court failed to recognize her successes under the treatment plan and for that reason, this Court should reverse the order terminating her parental rights. To the best of our understanding, we interpret Mother's argument to be challenging the district court's finding that "the conditions and causes of the abuse and neglect are unlikely to change in the foreseeable future." *See* § 32A-4-28(B)(2). We address only whether the conditions and causes of Child's neglect were unlikely to change in the foreseeable future.

**{29}** Our courts have interpreted the term "foreseeable future" to refer to corrective change within "a reasonable definite time or within the near future." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citation omitted). "[I]n balancing the interests of the parents and children, the [district] court is not required to place the children indefinitely in a legal holding pattern." *Id.* (internal quotation marks and citation omitted).

**{30}** Viewing the evidence in the light most favorable to the judgment, we conclude there was substantial evidence of a clear and convincing nature that the conditions and causes of Mother's abuse and neglect were unlikely to change in the foreseeable future. As we held above, CYFD provided clear and convincing evidence demonstrating that Mother failed to obtain safe and stable housing during the two years that the case was pending.

**{31}** We address the district court's finding that Mother's claims regarding employment and where she was residing lacked credibility. The court agreed with CYFD's evidence showing that Mother was not in fact residing where she claimed to reside and was not employed where she claimed to be employed. The court, therefore, found that Mother was deceiving CYFD and the court about important components of her treatment plan, components that were essential to keeping Child safe. Mother's lack of credibility on these components along with waiting until just before the scheduled TPR hearing to obtain verified employment with a senior living center, support the

district court's finding that Mother had failed to comply with her treatment plan by acquiring safe and stable housing for Child and stable employment and put in doubt whether Mother intended to maintain Child in a safe environment. Mother's testimony that she did not understand why CYFD found Grandmother's house unsafe adds support to the district court's finding that Mother would likely return Child to a place that was not safe once court oversight ended.

**{32}** This is substantial clear and convincing evidence that supports the district court's finding that Mother was unlikely to ameliorate the causes and conditions of abuse and neglect in the foreseeable future. *See State ex rel. Child., Youth & Fams. Dep't v. William M.*, 2007-NMCA-055, ¶ 66, 141 N.M. 765, 161 P.3d 262 ("[A]ny further delays in the [termination] proceedings threatened the welfare of . . . [Child], the [district] court was not obligated to wait indefinitely for [Mother] to resolve the issues that caused the abuse and neglect." ); *see also Vanessa C.*, 2000-NMCA-025, ¶ 29 (concluding that "[a]fter two years with limited or no long-term or sustained progress being made, we believe the [district] court could find that there was clear and convincing evidence that the causes and conditions of neglect would not change in the foreseeable future").

**{33}** In light of the testimony presented during the TPR hearing, we conclude there was substantial evidence of a clear and convincing nature supporting the district court's finding that the causes and conditions of Child's neglect were unlikely to change in the foreseeable future and affirm the termination of Mother's parental rights to Child.

**CONCLUSION**

**{34}** For the foregoing reasons, we affirm.

**{35}** **IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JANE B. YOHALEM, Judge**